895 A.2d 1088

**Jerry FULLBRIGHT a/k/a/ Jerry Everett Fulbright**

v.

**STATE of Maryland.**

**No. 2548, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

April 7, 2006.

---

Renee M. Hutchins, Ian Friedman (Michael Millemann, on brief), Baltimore, for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., SHARER and WOODWARD, JJ.

WOODWARD, J.

On December 6, 2004, a jury sitting in the Circuit Court for Baltimore City convicted appellant, Jerry E. Fullbright,[1] of one count of second-degree assault, one count of possession of a deadly weapon with intent to injure, one count of first-degree burglary, one count of third-degree burglary, and one count of fourth-degree burglary. The jury acquitted appellant of first-degree assault. On January 18, 2005, the court sentenced appellant to seven years imprisonment for the second-degree assault conviction and a consecutive three-year sentence for the possession of a deadly weapon with intent to injure conviction. The court merged the third-degree and fourth-degree burglary convictions into the first-degree burglary conviction, and sentenced appellant to a concurrent five-year term of imprisonment.

---

1.   A/k/a Jerry Everett Fulbright.

On appeal, appellant presents a single question for our review, which we have re-phrased:

Whether the trial court erred or abused its discretion by admitting the opinion of the investigating police officer, who was not qualified as an expert witness, to explain why a bloody knife used in the assault was not tested for fingerprints.

Finding no error, we affirm the judgments of the circuit court.

## BACKGROUND

This case arises out of the assault of Helen Ringer and burglary of her home during the early morning hours of Monday, February 16, 2004. At trial, in its case-in-chief, the State called two witnesses, Helen Ringer and Officer Bradley Bechtel of the Baltimore City Police Department. Ringer's testimony was as follows.

Ringer first met appellant through a mutual friend in September 2002, and she and appellant became bowling partners. Beginning in June 2003, Ringer and appellant became romantically involved and dated "off-and-on" until December 2003. Ringer testified that, during the course of their relationship, appellant had laid hands on her; she described those occasions as "[w]restling," which "got out of hand a couple of times," but "[n]othing violent." Ringer also stated that appellant stalked her, and would "pop up [at] various locations [she was] at" after she had told appellant that she did not want to see him. On one occasion, Ringer reported the stalking to the Baltimore County Police. According to Ringer, she told appellant that he should "go his separate way," but that "everywhere [she] went, he would all suddenly pop up, [and] continuously lie to things." She further recalled that once or twice a week she would find her vehicle tires flat, and that graffiti was written on the side of her home. Ringer suspected appellant, but did not file charges against appellant because she felt that she did not have enough evidence.

On the evening of February 15, 2004, Ringer, appellant, and members of their bowling league gathered at the Pinland

Bowling Alley on Dundalk Avenue in Baltimore County. Appellant, who was normally outgoing, was quiet that evening. He was also unusually dressed, wearing dark pants, an off-white solid long sleeve shirt, and a necktie.

Appellant left the bowling alley at around 10:00 p.m., approximately twenty minutes before Ringer. As Ringer drove home, she spotted appellant's white and pink leisure van in the lot of a McDonald's restaurant; the van was turned to face Dundalk Avenue. Frightened that appellant might be stalking her, Ringer met her friend, Bob Hittle, at Rigerio's Restaurant on Eastern Avenue, so that she could "calm down."

Ringer arrived home at about 11:55 p.m. When she reached her street, she noticed appellant's van parked on a dead end side street, approximately a block and a half from her house. Ringer drove past her house to see if appellant was there before driving around the block to double check that the van was appellant's. Although Ringer did not get out of her car and approach the van when she circled back around to look at it, she "kn[e]w it was [appellant's] van." When Ringer did not see anyone in the van, she proceeded home.

Ringer entered her house through the front door. At that time she was talking to Hittle on her cell phone. She went to her bedroom, turned on the night-stand light, and then walked towards the kitchen to get a can of Coca–Cola. As Ringer entered the kitchen, appellant, who was crouched down hiding in front of the refrigerator, attacked her. Ringer testified:

> [Appellant] jumped out at me and I noticed a knife in his hand. I grabbed the blade of that knife with my left hand and held on. I had put my hands up to defend myself, and that's when I got cut on my right hand. And I grabbed the knife blade with my left hand.

Ringer recognized the knife as her own; it was approximately ten inches long, with a wooden handle. Once she grabbed the knife, Ringer explained:

> I didn't let go. I held on to the knife and then I was forced to the—my floor because I wouldn't let go of the knife. He

kept saying, "Let go of the knife." And I said, "No, because you're going to kill me," and he said yes.

So I was not going to let go of that knife. And he actually got me to my kitchen floor. And then he started choking me. And I still wouldn't let go of the knife. And I begged with him to, please, let go of the knife, leave my home, that if he would leave that I would tell them someone broke in, I don't know who. And then I would not tell the police it was him.

After some time, Ringer was finally able to convince appellant to let go of the knife. Ringer testified that before appellant left her home, she heard him say: "Yes, you're going to tell the police it was me."

The attack lasted approximately ten to fifteen minutes, during which time Ringer could see appellant, and recalled that he was wearing the same clothes that he wore earlier that evening at the bowling alley.

Following the attack, Ringer called the police and an ambulance. As a result of the attack, Ringer sustained injuries to both of her hands, which required stitches and several weeks of physical therapy. Ringer positively identified appellant in court as the man who attacked her.

Ringer did not know how appellant got into her home. She had given him a key on a prior occasion to do work on the interior of the house, but appellant had returned that key. Ringer also noted that after the attack, she stopped getting flat tires.

Officer Bechtel testified that he responded to Ringer's home at 12:22 a.m. on February 16, 2004. When he encountered Ringer, she was suffering from several lacerations and her hands were bleeding. According to Officer Bechtel, Ringer was "calm," although "upset," and "she was trying to be composed." Ringer told Officer Bechtel that her ex-boyfriend attacked her with a knife. Officer Bechtel observed blood on the floors in the dining room, living room, and kitchen, as well as a bloody knife in the kitchen. He saw no evidence of forced

entry to Ringer's home. Officer Bechtel arranged for Ringer to be transported to Union Memorial Hospital.

Thereafter, Officer Bechtel called for the Crime Lab and a supervisor. The Crime Lab responded and took pictures of Ringer's home. Officer Bechtel directed the Crime Lab to recover the knife, which was covered with blood. That same night, the knife was marked as "Property Number 04008805," sealed in a box by the Crime Lab technician, and placed in Evidence Control.

Based on information provided by Ringer, Officer Bechtel arrested appellant at his home at around 2:00 a.m. on February 16, 2004. According to Officer Bechtel, the travel time between Ringer's home and appellant's home was approximately twenty minutes. At the time of his arrest, appellant was wearing gray dress pants and a striped shirt.

At trial, appellant called only one witness, an alibi witness, Bobby Hunter. Hunter testified that appellant worked for him on February 15, 2004, from 10:00 a.m. until 5:00 p.m. Hunter also testified that he was with appellant at a restaurant around the time of the attack. According to Hunter, he met appellant at around 10:10 p.m., at a Burger King. Appellant was wearing dress clothes. Appellant explained that he needed to have his van towed to his daughter's house, so Hunter followed as the van was towed. Thereafter, Hunter and appellant went to another restaurant where they remained until midnight. Hunter then drove appellant to his home, approximately fifteen to twenty minutes away from the restaurant. Appellant elected not to testify in his own defense.

On rebuttal, the State called Ringer's son-in-law, Andrew Horant. Horant testified that appellant contacted him during the afternoon of February 15, 2004, to tell him that his van was working again, and Horant could pick up the car that he had loaned appellant. When Horant arrived at appellant's house at around 2:00 p.m.—2:30 p.m., appellant was wearing dress pants. Appellant said that he had attended church services that morning. Horant also testified that he frequent-

ed the same Burger King where Hunter said that he met appellant on the night of February 15, 2004, and that he (Horant) believed that the restaurant closed at 10:00 p.m.

Regarding the single issued raised in this appeal, during opening argument, defense counsel stated, *inter alia:*

The problem in all of this is[,] is [appellant] the one that did it? Helen Ringer is going to tell you he did. But you're going to hear that the knife that was used was left behind, never printed.

The house was never printed. His hands were never tested to see whether there was any blood on them. The clothing he was wearing was never taken into evidence. His house was never searched to see whether there was any blood, any clothing, the key to her house, none of that.

His keys weren't taken into evidence to see whether he had a key to her house. Because you're going to hear there's no sign of forced entry.

His van was never searched. There's absolutely no evidence you're going to hear corroborate that he is the one that cut her hands.

During his testimony, Officer Bechtel identified the box and the knife. He described the knife as having a four and one-half inch handle and a seven and one-half inch blade. He noted that the box was marked with a property tag, a biohazard sticker (due to blood on the knife at the time it was recovered), as well as the complaint number. Thereafter, without objection, the knife was admitted into evidence as State's Exhibit Number 4.

With regard to the knife, on direct examination, Officer Bechtel testified, as follows:

[PROSECUTOR]: Now, Officer Bechtel, to your knowledge, were any prints conducted on that knife?

[BECHTEL]: No.

[PROSECUTOR]: And why weren't prints conducted on that knife?

[BECHTEL]: At the time of the incident, there was blood that was still on there. It was in a wet condition. You know, stating that, from my past—from my experience—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: You may continue[.]

[BECHTEL]: From my experience and training in the Police Academy in regards to recovering latent prints—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[BECHTEL]: Off the knife or off of wet objects, it's pretty much—it's hard to get good prints off of blood.

Later, on cross-examination, Officer Bechtel testified:

[DEFENSE COUNSEL]: Okay. Now, you said that you recovered the knife and you did not try to get any—you did not submit it for fingerprints?

[BECHTEL]: Correct.

[DEFENSE COUNSEL]: And that was based on training you received in the Academy four years ago?

[BECHTEL]: Yes.

[DEFENSE COUNSEL]: You've never worked in a crime lab; is that correct?

[BECHTEL]: That's correct.

[DEFENSE COUNSEL]: Did you even try to submit it just to see whether your training in the Academy could be wrong?

[BECHTEL]: Based on my training in the Academy, I—I submitted it as evidence.

[DEFENSE COUNSEL]: But you didn't submit it to the Crime Lab to see whether they could try to find prints on the knife?

[BECHTEL]: No, I did not.

Defense counsel then elicited from Officer Bechtel the following admissions regarding the police investigation. Officer Bechtel did not ask the Crime Lab to check appellant's hands

for blood or the door knob in Ringer's home for fingerprints. He did not obtain a search warrant for appellant's house or van. Officer Bechtel did not recover any clothing that appellant was wearing at he time of the attack, nor did he check appellant's house or van for clothing, shoes with blood on the bottom, or "any type of evidence at all." When appellant was arrested, Officer Bechtel did not take appellant's keys and did not check to see if there was a key to Ringer's home on appellant's key ring. Officer Bechtel also did not try to find a key to Ringer's home in appellant's house or van. He did not know whether there was any blood in the van.

Defense counsel concluded the above line of inquiry as follows:

[DEFENSE COUNSEL]: Basically ... Ringer said that [appellant] did it. Did you do any further investigation after that?

[BECHTEL]: No.

### DISCUSSION

Relying on the recent Court of Appeals case, *Ragland v. State*, 385 Md. 706, 870 A.2d 609 (2005), appellant argues that the trial court erred in admitting testimony from Officer Bechtel that, based on his training and experience, it is "hard" to recover "good" latent fingerprints from wet objects. According to appellant, by admitting Officer Bechtel's testimony explaining the reason why he did not obtain fingerprints from the bloody knife found in Ringer's home following the attack, the court improperly allowed Officer Bechtel to give an unqualified expert opinion that "plugged a hole in the State's case." Consequently, appellant argues that his conviction must be reversed.

In response, the State contends that appellant's argument regarding the admission of Officer Bechtel's opinion was waived, because defense counsel elicited the same opinion from Officer Bechtel on cross-examination. Nevertheless, the State asserts that Officer Bechtel's testimony was not the sort of testimony that the Court of Appeals found objectionable in

*Ragland,* because Officer Bechtel's opinion was not used to prove an element of the crime alleged, but merely to explain why the knife was not tested for fingerprints. In addition, the State contends that because defense counsel raised the lack of fingerprint evidence from the knife in her opening statement, Officer Bechtel's testimony amounted to anticipatory rehabilitation evidence, and the trial court did not abuse its discretion by admitting such testimony.[2]

■ As a threshold matter, we reject the State's preservation argument. Simply stated, appellant did not waive his objection to Officer Bechtel's testimony regarding his explanation for not submitting the bloody knife for fingerprint analysis, by re-raising that issue with Officer Bechtel on cross-examination. *See Peisner v. State,* 236 Md. 137, 144, 202 A.2d 585 (1964) ("The general rule in Maryland is that one does not lose the benefit of objection to [alleged] inadmissible testimony by cross-examining on the subject."). Appellant did not lose the benefit of the objection to Officer Bechtel's testimony by the cross-examination of Officer Bechtel on the same issue in an attempt to weaken the impact of what appellant considered to be erroneously admitted evidence.

### *Ragland v. State*

■ Regarding the merits of the issue on appeal, appellant places great emphasis on *Ragland,* 385 Md. 706, 870 A.2d 609, in support of his position that the trial court committed reversible error when it allowed Officer Bechtel, who was not qualified as an expert witness, to testify, in response to the question of why he did not submit the bloody knife for fingerprint analysis, that based on his training and experience,

---

**2.** The State also argues that, even if Officer Bechtel's testimony was improperly admitted by the trial court, such error was harmless, because Ringer's identification of appellant as her assailant was sufficient to sustain appellant's conviction, and Officer Bechtel's testimony did not bolster the State's case or prejudice appellant. In light of our holding that there was no error or abuse of discretion in admitting Officer Bechtel's opinion, we need not address this argument.

"it's hard to get good prints off of blood." Appellant's reliance on *Ragland* is misplaced. We explain.

In *Ragland,* appellant was convicted of distribution of a controlled dangerous substance. *See id.* at 709, 870 A.2d 609. On March 18, 2003, members of the Montgomery County Police Special Assignment Team observed Paul Herring, a person known to them from a prior arrest, make two short telephone calls from two different gas stations, and then drive to Northwest Drive. *See id.* At Northwest Drive, a hand-to-hand transaction occurred between Herring and a man wearing a hat, who was sitting in the passenger seat of a parked, yellow Cadillac. *See id.* at 709–10, 870 A.2d 609. No officer was able to see the face of the Cadillac's passenger or the items exchanged with Herring. *See id.*

After the parties left the scene of the exchange on Northwest Drive, Herring's van was stopped and a piece of suspected crack cocaine was found on Herring's person. *See id.* at 710, 870 A.2d 609. The Cadillac was also stopped and its three occupants were arrested. *See id.* Appellant was sitting in the front passenger seat; he was wearing a multi-colored beret. *See id.*

At trial, two police officers offered "lay opinion" testimony, based on their training and experience, that the series of events involving appellant and Herring constituted a drug transaction. *See id.* at 709, 870 A.2d 609. Before the Court of Appeals, appellant argued that such evidence "should only have been admitted as expert testimony, subject to the accompanying qualification and discovery procedures." *Id.* The Court of Appeals agreed, and held that "M[arylan]d Rules 5–701 [governing lay opinion testimony] and 5–702 [governing expert opinion testimony] prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Id.* at 725, 870 A.2d 609. Accordingly, the Court vacated appellant's conviction and remanded the case for a new trial. *See id.* at 709, 870 A.2d 609.

In reaching its holding, the Court explained the difference between expert opinion testimony and lay opinion testimony:

Expert opinion testimony is testimony that is based on specialized knowledge, skill, experience, training, or education. Expert opinions need not be confined to matters actually perceived by the witness. Lay opinion testimony is testimony that is rationally based on the perception of the witness.

*Id.* at 717, 870 A.2d 609. Quoting the U.S. Court of Appeals for the Third Circuit, the Court further distinguished lay opinion testimony:

"The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.... Other examples of this type of quintessential Rule 701 testimony include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, the value of one's property."

*Id.* at 718, 870 A.2d 609 (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1196–98 (3rd Cir.1995)).

Applying that rationale to the facts of *Ragland,* the Court determined that the State "sought and received opinions" from the police officers "that were based on those witnesses' specialized knowledge, experience, and training." *Ragland,* 385 Md. at 725, 870 A.2d 609. The Court explained that such testimony could not be described as lay opinion because: (1) the witnesses "had devoted considerable time to the study of the drug trade;" (2) "they offered their opinions that, among the numerous possible explanations for the events on Northwest Drive, the correct one was that a drug transaction had taken place;" and (3) "[t]he connection between the officers' training and experience on one hand, and their opinions on the other, was made explicit by the prosecutor's questioning." *Id.* at 726, 870 A.2d 609.

Finally, the Court rejected the State's contention that any error in the admission of the officers' opinions was harmless. *See id.* The Court explained that Herring, the State's primary witness, was an impeached witness, who was also a participant in the alleged crime. *See id.* The remaining evidence was circumstantial, depending upon an inference that the piece of crack cocaine found on Herring when he was stopped had been obtained from appellant in the transaction observed by the police officers minutes before. *See id.* at 727, 870 A.2d 609. To prove that inference, "the State relied in large part on the police officers' opinion testimony that the events on Northwest Drive had constituted a drug transaction." *Id.* Accordingly, the Court could not say beyond a reasonable doubt that the admission of the police officers' opinions was harmless. *See id.*

The case *sub judice* is clearly distinguishable from *Ragland.* First, Officer Bechtel's testimony that, based on his training and experience, it is hard to get good prints off wet objects, was not opinion evidence, expert or lay, because the State did not offer his testimony for its truth. Rather, Officer Bechtel was asked by the State to explain his conduct as the investigating police officer, *i.e.,* why he did not submit the bloody knife for fingerprint analysis. He responded by referring to his knowledge of "recovering latent prints" gained from his "experience and training in the Police Academy."

Opinion evidence, by definition, is "testimony of a witness, given or offered in the trial of an action, that the witness is of the opinion that some fact pertinent to the case exists or does not exist, offered as proof of the existence or nonexistence of that fact." Ballentine's Law Dictionary 893 (3d ed.1969); *see also* Black's Law Dictionary 598 (8th ed.2004) (defining "opinion evidence" as "[a] witness's belief, thought, inference or conclusion concerning a fact or facts"). In *Ragland,* the State introduced the officers' opinions that the events they observed constituted a drug transaction in order to prove that those events were *in fact* a drug transaction. By contrast, in the instant case, the State did not elicit Officer Bechtel's opinion to prove that it was *in fact* hard to get good fingerprints off of

wet objects. Rather, the State sought his opinion for the sole purpose of explaining to the jury why Officer Bechtel, as the investigating officer, did not submit the bloody knife for fingerprint analysis. In short, the jury was not called upon to determine the truth or falsity of Officer Bechtel's opinion.

Second, Officer Bechtel's opinion regarding the quality of latent fingerprints from wet objects was not introduced to prove an essential element of the offenses for which appellant was charged. Officer Bechtel's opinion did not directly relate to any element of the crimes of assault, possession of a deadly weapon, or burglary, but rather was directed to the issue of the adequacy of the police investigation. The State had un-impeached, eyewitness testimony from Ringer, the victim and appellant's ex-girlfriend, that appellant was the person who broke into her home and assaulted her with a knife during the early morning hours of February 16, 2004. Officer Bechtel's explanation for his actions or omissions, as the investigating officer, was introduced simply to counter any defense argu-ment to the jury of reasonable doubt arising out of an alleged inadequate police investigation.

In *Ragland,* on the other hand, the police officers observed a hand-to-hand transaction between appellant and Herring, but could not see any of the items that appellant had ex-changed with Herring. Herring was stopped by police and a piece of crack cocaine was found on his person. To obtain a conviction, the State had to prove that Herring obtained the crack cocaine from appellant. That proof came from an inference based on the police officers' opinion testimony that the hand-to-hand transaction between appellant and Herring was a drug transaction. Thus, the opinion testimony of the police officers was necessary to prove an essential element of the charge against appellant in *Ragland.*

### Anticipatory Rehabilitation Evidence

We find further support for the trial court's decision to admit Officer Bechtel's opinion in the doctrine of anticipatory rehabilitation evidence. At trial, defense counsel sought to generate reasonable doubt by attacking the sufficiency of the

police investigation. Defense counsel challenged Officer Bechtel's performance of his duties as the investigating officer, which performance was based on his training, experience, and specialized knowledge as a police officer. In her opening statement to the jury, defense counsel claimed that the knife used in the assault was never fingerprinted; that appellant's house was never printed; that appellant's hands were never tested for blood; that the clothing worn by appellant was never taken into evidence; that appellant's house was never searched; that keys to Ringer's home were never taken from appellant; and that appellant's van was never searched. Defense counsel concluded that "[t]here's absolutely no evidence you're going to hear corroborate that he is the one that [sic] cut her hands."

Faced with this broad challenge to the police investigation, the State predictably sought to minimize its impact by asking Officer Bechtel, on direct examination, why he did not submit the knife for fingerprint analysis. In his answer, Officer Bechtel explained that it was hard to get good prints off of wet objects, based on his "experience and training in the Police Academy."

Defense counsel continued her attack on the police investigation in her cross-examination of Officer Bechtel. She got Officer Bechtel to admit to everything that she told the jury in opening statement was not done in the investigation of the assault on Ringer. Officer Bechtel also admitted that, in essence, there was no investigation after Ringer identified appellant as her attacker. Finally, in her closing argument, defense counsel told the jury:

This is a criminal case. They've charged [appellant] with burglary, with assault. They've charged [appellant] with breaking into a woman's house and cutting her hand, and *they do no investigation at all.*

As citizens of Baltimore City, *you ought to be outraged that it wasn't done.*

(Emphasis added).

Ordinarily, a party " 'may not sustain the credibility of his own witness absent an attack upon credibility by the other

side.' " *State v. Werner,* 302 Md. 550, 561, 489 A.2d 1119 (1985) (quoting *City of Baltimore v. Zell,* 279 Md. 23, 27, 367 A.2d 14 (1977)).  However, a witness whose credibility has been attacked may be rehabilitated by permitting the witness to deny or explain the impeaching facts.  *See* Md. Rule 5–616(c)(1). "[R]ehabilitation must consist of repairs made at the point of the attack rather than fortification of areas that have not been disturbed."  Joseph F. Murphy, Jr., Maryland Evidence Handbook § 1305 (3d ed.1999).  " 'Why?' 'How?' and 'please explain . . .' are usually excellent redirect examination questions."  *Id.*

█  Rehabilitation evidence, however, need not be confined to redirect examination.  Anticipatory rehabilitation evidence may be introduced during the direct examination of a witness for the State "if the opening statement of [the defendant's] trial counsel predicts that jurors will receive evidence that would—when presented—'open the door' to the [rehabilitation evidence]."  *Hopkins v. State,* 137 Md.App. 200, 208, 768 A.2d 89 (2001); *see also Clark v. State,* 332 Md. 77, 84–85, 629 A.2d 1239 (1993) (explaining that " 'opening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue' ").

In *Hopkins,* 137 Md.App. 200, 768 A.2d 89, the defendant was convicted of second-degree assault on the twelve-year-old daughter of his former girlfriend.  In the opening statement, defense counsel stated that a social worker would testify that the defendant's former girlfriend admitted to making up the charges against the defendant and lying to the police.  *See id.* at 207–08, 768 A.2d 89.  During the direct examination of the former girlfriend, the State introduced into evidence a prior consistent written statement that she had given to an investigating officer.  *See id.* at 207, 768 A.2d 89.  We concluded that because the opening statement of defense counsel predicted that the jurors would hear the social worker's testimony, which, when presented, would "open the door" to the introduction of the former girlfriend's prior consistent statement, the

trial judge had the discretion to admit that statement during the former girlfriend's direct examination.[3] *See id.* at 208, 768 A.2d 89.

Similarly, in the instant case, the opening statement of defense counsel set forth in detail the alleged deficiencies in the police investigation of the charges against appellant, and predicted a lack of corroborating evidence due to that inadequate investigation. Consequently, the trial court had the discretion to permit the State to obtain, on direct examination, an explanation from Officer Bechtel for his conduct as the investigating police officer. *See* Md. Rule 5–611 (authorizing the trial judge to exercise discretion over the order in which and the methods by which evidence is presented). Without such explanation, appellant would have "an unwarranted advantage in impeaching a witness with an assurance that his credibility would remain impaired." *State v. Farmer*, 97 Ariz. 348, 400 P.2d 580, 583 (1965).

We hasten to note that our holding in this case does not permit the admission into evidence of a police officer's expert opinion *for its truth* any time a police investigation is challenged by a defendant, unless the proper qualification and notice requirements have been met. We do not intend to allow entering in the back door what *Ragland* forbids coming in the front door. A defendant can always request a limiting instruction so that the jury is advised that the officer's opinion is not offered for its truth, but only as an explanation for the officer's conduct of the police investigation. *See* Murphy, *supra,* § 1305(E) (explaining that "[c]autionary, curative and limiting instructions are given during trial when there is a danger that jurors will be exposed to information they should not consider, and/or that the jurors might make improper use of the information they have been exposed to").

For these reasons, we hold that the trial court did not err or abuse its discretion by admitting the opinion of the investigat-

---

**3.** The statement also must meet the requirements of Maryland Rule 5–616(c). *See Hopkins,* 137 Md.App. at 208 n. 6, 768 A.2d 89.

ing police officer, who had not been qualified as an expert witness, to explain why the bloody knife used in the assault was not tested for fingerprints.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; APPELLANT TO PAY COSTS.**