David Leander Ford v. State of Maryland, No. 11, September Term, 2018

**MARYLAND RULE 5-404(a)(2)(C) – HOMICIDE CASE – ALLEGED VICTIM'S TRAIT OF PEACEFULNESS – MEANING OF "EVIDENCE" – OPENING THE DOOR – HARMLESS ERROR – CONSCIOUSNESS OF GUILT – RELEVANCE – DANGER OF UNFAIR PREJUDICE – CONSIDERATIONS OF CUMULATIVE EVIDENCE –** Court of Appeals held that Maryland Rule 5-404(a)(2)(C) does not permit prosecutor to offer evidence of alleged victim's trait of peacefulness to rebut statements made by defense counsel in opening statement because opening statements are not evidence, and Maryland Rule 5-404(a)(2)(C) specifically requires that "evidence that [] victim was [] first aggressor" be introduced before prosecutor may rebut such evidence with "evidence of [] alleged victim's trait of peacefulness[.]"  Court of Appeals held that defense counsel's remarks during opening statement did not "open door" for prosecutor to present evidence of alleged victim's trait of peacefulness because, even if defense counsel's remarks placed victim's actions and character at issue and somehow indicated that defendant would perhaps offer evidence to prove that victim was aggressor, Maryland Rule 5-404(a)(2)(C) definitively requires evidence that victim was first aggressor—not merely statement indicating that some evidence might possibly be introduced—to trigger State's ability to rebut with evidence of victim's trait of peacefulness.  Court of Appeals held that trial court erred in concluding that defense counsel had opened door for State to present evidence of victim's trait of peacefulness under Maryland Rule 5-404(a)(2)(C), and in permitting State, over objection, to elicit testimony in its case-in-chief from State's witnesses about victim's trait of peacefulness.  Court of Appeals, nevertheless, held that error was harmless beyond reasonable doubt.

Court of Appeals held that trial court properly permitted defendant's ex-girlfriend to testify about defendant's reaction to being told that he had to leave her home—specifically, that he "cursed [her] out, and he slammed back [] front door and left"—as evidence of consciousness of guilt.  Court of Appeals concluded that trial court did not err in determining that evidence of defendant's post-crime conduct was relevant to show defendant's guilty state of mind—specifically, that he was staying at his ex-girlfriend's home to hide from law enforcement and did not want to leave because he wanted to continue hiding out and elude capture.  Court of Appeals also concluded that trial court did not abuse its discretion in concluding that danger of unfair prejudice or considerations of cumulative evidence did not substantially outweigh probative value of evidence.

Circuit Court for Anne Arundel County
Case No. C-02-CR-15-000033

Argued: September 13, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2018

_____

DAVID LEANDER FORD

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.

_____

Filed: October 26, 2018

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document " authentic.



Suzanne C. Johnson, Acting Clerk

This case concerns two issues involving the admissibility of evidence in a murder trial. First, we consider admissibility of character evidence of the victim under Maryland Rule 5-404(a)(2)(C), which provides: "In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." Here, the trial court, over defense counsel's objections, permitted the State, Respondent, to present evidence of the alleged victim's trait of peacefulness in its case-in-chief during direct-examination of two State's witnesses to rebut remarks made by defense counsel in opening statement that the defendant was not the aggressor and had acted in self-defense.

The second issue concerns the admissibility of evidence of the defendant's post-crime conduct as consciousness of guilt, and specifically, the determination that such evidence was relevant and that the danger of unfair prejudice or considerations of cumulativeness did not substantially outweigh the probative value of the evidence. Here, evidence was adduced at trial that, after stabbing the victim, the defendant fled to his ex-girlfriend's home. Over objection, the trial court permitted the State to elicit testimony from the defendant's ex-girlfriend that, the morning following commission of the crime, she asked him to leave, and the defendant cursed at her, slammed the front door, and left. The trial court admitted evidence of the defendant's reaction to being told that he had to leave his ex-girlfriend's home as evidence of consciousness of guilt.

As to the first issue, we hold that Maryland Rule 5-404(a)(2)(C) does not permit a prosecutor to offer evidence of an alleged victim's trait of peacefulness to rebut statements made by defense counsel in opening statement because opening statements are not

evidence, and Maryland Rule 5-404(a)(2)(C) specifically requires that "**evidence** that the victim was the first aggressor" be introduced before the prosecutor may rebut such evidence with "evidence of the alleged victim's trait of peacefulness[.]" (Emphasis added). Moreover, we hold that defense counsel's remarks during opening statement did not "open the door" for the prosecutor to present evidence of the alleged victim's trait of peacefulness. This is so because, even if defense counsel's remarks placed the victim's actions and character at issue and somehow indicated that the defendant would perhaps offer evidence to prove that the victim was the aggressor, Maryland Rule 5-404(a)(2)(C) definitively requires evidence that the victim was the first aggressor—not merely a statement indicating that some evidence might possibly be introduced—to trigger the State's ability to rebut with evidence of the victim's trait of peacefulness. Accordingly, the trial court erred in concluding that defense counsel had "opened the door" for the State to present evidence of the victim's trait of peacefulness under Maryland Rule 5-404(a)(2)(C), and in permitting the State, over objection, to elicit testimony in its case-in-chief from State's witnesses that the victim was a "quiet, nice person[, n]ice to everybody[,]" and "a cool person[, h]e was never, you know nasty or hostile, or anything." Nevertheless, we hold that the error was harmless beyond a reasonable doubt.

As to the second issue, we hold that the trial court properly permitted the defendant's ex-girlfriend to testify about the defendant's behavior and reaction to being told that he had to leave her home—specifically, that he "cursed [her] out, and he slammed back the front door and left"—as evidence of consciousness of guilt. We conclude that the trial court did not err in determining that this evidence of the defendant's post-crime conduct was relevant

- 2 -

to the defendant's guilty state of mind—specifically, that he was staying at his ex-girlfriend's home to hide from law enforcement and did not want to leave because he wanted to continue hiding out and elude capture. Additionally, we conclude that the trial court did not abuse its discretion in concluding that the danger of unfair prejudice or considerations of cumulative evidence did not substantially outweigh the probative value of the evidence.

## BACKGROUND

On August 7, 2015, in the Circuit Court for Anne Arundel County, a grand jury indicted David Leander Ford, Petitioner, for first-degree premeditated murder, second-degree murder, manslaughter, and carrying a weapon openly with the intent to injure. The charges arose out of an incident that occurred on the evening of July 8, 2015, during which Ford allegedly engaged in an altercation with Mohamed Bashir Eltahir and fatally stabbed him.

From September 19 to 22, 2016, the circuit court conducted a jury trial. At the start of trial, the prosecutor *nol prossed* the charge of first-degree premeditated murder. Also, at the start of trial, Ford's counsel moved *in limine* to exclude evidence that Ford had a "temper." The prosecutor requested that the circuit court reserve ruling on the matter to "see how the trial plays out before [] mak[ing] an ultimate ruling on whether that evidence becomes relevant[.]" The circuit court agreed with the prosecutor and stated that it would "reserve on the issue of [Ford] ha[ving] a temper."

During the State's opening remarks, the prosecutor set forth the State's theory of the case, positing that Ford instigated a verbal argument with Eltahir, and was responsible

both for escalating the argument to a physical altercation and for subsequently introducing a knife into the physical altercation. Specifically, the prosecutor stated as follows. On the evening of July 8, 2015, Eltahir and his friend, Everett Kane, purchased alcoholic beverages, and took the drinks and sat on a park bench together. According to the prosecutor, Eltahir was "relaxed" and "enjoying himself." Others joined the two men, including Ford, who "made a crude comment about" a woman walking by, equating her to Eltahir's sister. Eltahir asked Ford to stop. Ford declined to stop and instead escalated the verbal exchange by jumping off the park bench, continuing to swear, and "get[ting] into [Eltahir]'s face." In response, Eltahir stood and "argued right back." Others tried to defuse the situation, but the two men continued to argue until Ford swung his fist and struck Eltahir in the chest. According to the prosecutor, Ford "was the first one to make th[e] argument physical." Ford kept hitting Eltahir, but Eltahir "finally got a hit in too, and he knocked [Ford] down to the ground." When Ford stood up, others saw him stab Eltahir in the chest with a knife. According to the prosecutor, the "knife went straight into [Eltahir]'s chest, and into his heart[,]" and he died shortly thereafter. Ford fled the scene, eventually going to the home of Sheila Brown, his ex-girlfriend, whom he told that he had "cut a boy."

Ford's theory of the case was that he acted in self-defense. During Ford's opening statement, his counsel posited that, although Ford insulted Eltahir, Eltahir was younger, bigger, faster, and stronger than Ford, and Eltahir was the aggressor who initiated physical contact. Specifically, Ford's counsel stated:

> He had a choice to defend himself or he had a choice to get badly injured, perhaps even killed.

- 4 -

What [] Ford chose to do that night was to defend himself. . . .

[Eltahir] is a security guard, he was drinking that night. [Yo]u are going to hear evidence that [Eltahir] is younger than [] Ford, faster than [] Ford, bigger than [] Ford, and stronger than [] Ford. And [] Ford is not the person [who] initiates any physical contact, that's [Eltahir].

So [] Ford finds himself being attacked by someone that's larger, someone that's stronger, someone that's faster, and someone that's bigger. And [] Ford makes a choice to defend himself. [] Ford is forced to react. The only goal that [] Ford had that day was to defend himself, and to make sure that he didn't get hurt.

\* \* \*

[Eltahir]'s death is certainly tragic, but it is not at all intentional. So I ask you to listen to all the evidence that's presented before you make a decision and you'll realize that [] Ford was in a situation where he was overmatched. He was in a situation where he was reacting out of fear, and that he certainly wasn't the aggressor.

He made an offhand verbal comment but he was not the physical aggressor. And most importantly he had a reasonable belief that he was in [im]minent danger. And he had that belief because he was. He was in [im]minent danger. He was forced to react and he had absolutely no intent to kill him.

At the close of opening remarks, the prosecutor requested a brief bench conference. At the bench conference, the prosecutor argued that Ford's counsel's assertion that Eltahir was the aggressor "opened the door" for the State to introduce evidence "about whether [Ford] has a temper or not," and "general evidence about" Ford's character for peacefulness or aggressiveness. According to the prosecutor, Eltahir's "nature for peacefulness [was] fair game at th[at] point, and because [the defense was] claiming self-defense, [Ford]'s nature bec[a]me[] fair game." Ford's counsel objected. After hearing argument from the parties, at this point, the circuit court ruled that Ford's counsel's statements during opening

remarks had not opened the door "sufficiently" for the State "to use it in [its] case[-]in[-]chief."

As the first witness for the State, Barbara McQueen testified that she knew Eltahir for approximately six months and that she saw him "[a]lmost every day." The following exchange occurred concerning McQueen's knowledge of Eltahir:

[PROSECUTOR:] Okay, and how about his demeanor, his personality?

[MCQUEEN:] Quiet, just overall a nice person.

[PROSECUTOR:] Okay. Did you have occasion to observe his peacefulness?

[MCQUEEN:] Yes.

[FORD'S COUNSEL]: Objection.

THE COURT: Rephrase counsel.

[PROSECUTOR]: Okay.

[PROSECUTOR:] Did you have occasion to observe his nature with regards -- his, his nature I guess.

[FORD'S COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR:] Were you able to observe his demeanor and nature?

[MCQUEEN:] Was quiet, nice person. Nice to everybody.

[PROSECUTOR:] Did you see, observe whether he would get angry easily, or if it would take a lot to get him angry?

[FORD'S COUNSEL]: Objection.

THE COURT: Rephrase Counsel, sustained.

[PROSECUTOR:] Did you have [the] ability to observe his character towards peacefulness or aggressiveness?

[FORD'S COUNSEL]: Same objection.

THE COURT: Sustained, rephrase Counsel.

[PROSECUTOR:] In your contact, did you ever have [the] opportunity -- okay. Did you -- were you able -- aware of his reputation for peacefulness or aggression[?]

[FORD'S COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR:] Were you aware of his reputation for peacefulness or aggressi[on]?

[MCQUEEN:] Yes.

[PROSECUTOR:] And what was that reputation?

[MCQUEEN:] We would sit on the bench and talk, and we went to restaurants and ate with him.

McQueen testified that, on the evening of July 8, 2015, she and her friend Katherine Platter went to the park near her apartment complex, where Eltahir and Kane were sitting on a park bench drinking. Eltahir was not drunk or slurring his speech, and was acting "[q]uiet and nice as usual." At some point, Ford arrived carrying "two or three [shopping] bags[,]" which he put down at the end of the walkway before he sat on the park bench with Eltahir and Kane. McQueen testified that two women walked by, and described how an argument began between Ford and Eltahir:

> [Ford] said, "Man I want to (expletive) your sister, he say, I wrap her hair around her head, and I want to (expletive) your sister". And [Eltahir] said, "Man what are you talking about". And [Ford] leaned over and said, "What, you don't understand what the (expletive) I'm saying?" He said, "I said I

- 7 -

want to (expletive) your sister". So then, that's how the argument started.

McQueen testified that, following this verbal exchange, Ford stood up and "got in [Eltahir]'s face." Eltahir also stood up, and Platter "jumped up, and [] got in between [Ford] and [Eltahir], and started pushing them apart." Ford hit Eltahir, who stumbled back; according to McQueen, Ford hitting Eltahir was the first physical contact made during the altercation. Eltahir then hit Ford, who "fell back on his knees." Ford got back up and hit Eltahir in the chest. McQueen saw Ford hit Eltahir "about four times" and saw Eltahir hit Ford only once. After Ford hit Eltahir in the chest, Platter told Eltahir to sit down, and as Eltahir began to sit, he told Ford: "Since you say (expletive) my sister, (expletive) your mother[.]" Ford started "hitting" Eltahir again, and when Eltahir sat down, McQueen saw blood. Ford told Kane to grab his grocery bags, and then both men ran. As Ford passed by McQueen, "[h]e had [a] knife in his hand, and he had blood running down his arm."

Subsequently, McQueen telephoned 911. Law enforcement officers responded to the 911 call and McQueen was interviewed by detectives. Detectives showed McQueen a photographic array, and she identified Ford as the person who stabbed Eltahir. McQueen acknowledged telling detectives that she was "about fifty percent sure[,]" but testified that there was no doubt in her mind that Ford stabbed Eltahir, and she identified Ford in the courtroom.

On cross-examination, McQueen acknowledged telling law enforcement officers the following in an interview: "And then after that, I basically really couldn't see too much, because [Platter] was, big as she is, was standing up there, and then when she turned around, that's when we saw all the blood[.]" Later on cross-examination, though,

- 8 -

McQueen testified that she "did see" Ford stab Eltahir. Ford's counsel also asked McQueen to describe Eltahir's reaction to Ford's comment that he wanted to "(expletive) [Eltahir's] sister[,]" and McQueen acknowledged that Eltahir did not react well, but denied that Eltahir became "visibly angry[.]" On redirect, McQueen testified that there was no blood on Eltahir's shirt when he arrived at the park bench, and that Ford was the only person to make physical contact with Eltahir's chest.

As a witness for the State, Kane testified that, as of July 2015, he had known Eltahir for approximately six months, and they were "close friends." The prosecutor asked Kane to describe Eltahir, and Kane testified: "He was a, you know, quiet, you know, quiet person. You know, we always sat and talked. . . . And he was never, you know, hostile or anything." Ford's counsel objected, and the circuit court sustained the objection. The prosecutor asked to approach, and at a bench conference, stated that she was seeking Kane's opinion as to "Eltahir's character for peacefulness." The circuit court stated that it had sustained the objection because of "[t]he context of the question." Ford's counsel argued that a proper foundation had not been laid. The following exchange occurred:

> [PROSECUTOR:] They said that the victim was the aggressor, in that, that their client wasn't the aggressor. That their client -- I'm not asking about his character at this point, it's the victim's character. . . . And I believe that in opening, when they throw the issue down that my person was the aggressor, that I am able at that point, under that rule to rebut it. They said that their client only reacted out of fear. That . . . [the] victim was the aggressor. That he was only defending himself.
>
> THE COURT: You did say that, counsel. . . . In your opening.
>
> [FORD'S COUNSEL]: Well, . . . the issue though, is . . . that's not evidence. And as far as the state of the evidence goes, there is nothing to rebut as of yet.

THE COURT: . . . [T]he Court did not rule that you had opened the door for purposes of those discussions, as they related to [Ford.]

In this particular case, you painted the victim as the faster, bigger, stronger, struggle that he was not -- your client was not the aggressor that the other fellow was. And his responses were out of scare [sic], and reaction, and the fear[.]

* * *

[FORD'S COUNSEL]: Right, but . . . there was no statement in the opening that [] Eltahir was an angry -- or that he was (inaudible few words). It's much more a description of his physical -- it's not about his peace --

THE COURT: You said your client acted out of fear because the other fellow was the aggressor. . . . The prosecution may offer evidence of his traits for peacefulness. And the evidence in this case, although not evidence in the traditional sense, . . . you have, however, opened the door and she may present testimony that the victim, in this case, was of a peaceful nature. That's what the testimony is going to be.

Or testimony that would rebut [] your opening about his aggressiveness.

After the bench conference, the prosecutor asked Kane about his opinion as to

Eltahir's peacefulness during the following exchange:

[PROSECUTOR: D]id you have an opportunity to -- so you talked about how you interacted with [Eltahir], did you have an opportunity to see him interact with other people?

[KANE:] Yes.

[PROSECUTOR:] Okay, and based on what you saw with his interactions with other people, and how [h]e was with you, did you form an opinion as to [Eltahir]'s peacefulness?

[KANE:] Yes.

[PROSECUTOR]: And what was that opinion?

[KANE:] He was --

- 10 -

[FORD'S COUNSEL]: Same objection, Your Honor.

THE COURT: Overruled.

[KANE:] He was a cool person. He was never, you know nasty or hostile, or anything.

Kane testified that, on the evening of July 8, 2015, he and Eltahir picked up some beer from a liquor store and then sat on a park bench; Eltahir also had some liquor. McQueen and Platter joined them. Eltahir did not appear drunk, and was not slurring his words or stumbling. At some point, Ford arrived with groceries, which he put down on the sidewalk before sitting down on the bench. Ford sat down next to Kane and began talking to Eltahir. Ford told Eltahir "I want to (expletive) your sister[,]" which caused Kane to get up and move because Eltahir did not "really like you talking about his family[.]" Kane testified that, when someone talked about Eltahir's family, Eltahir would "get mad. He wasn't getting like, you know, mad, mad, like that. He would just, you know, be upset."

After Kane got up and moved, he walked back and forth because he "was a little tipsy[,]" and Ford and Eltahir were "arguing back and forth, or talking back and forth." At some point, Ford and Eltahir stood up, and Platter stepped between them, "trying to stop them from fighting or whatever they w[ere] getting ready to do." Kane saw Ford and Eltahir "pushing each other back and forth[,]" but he did not see "who pushed who first" because he had his back turned. At some point thereafter, Kane saw blood on Eltahir's shirt. There had not been blood on Eltahir's shirt before the physical altercation with Ford, and nobody other than Ford had touched Eltahir. After Kane noticed that Eltahir was bleeding, Ford "told [Kane] to take his bags to" someone named Dewey, so he "grabbed

- 11 -

[Ford's] bags, and [Ford] was already walking away." Kane took the bags to Dewey's home and then returned to the bench. Kane saw a scratch on Ford's arm, but he did not see any weapons on Eltahir.

Law enforcement officers interviewed Kane, who initially falsely said that he did not see anything and that he was not present during the altercation. According to Kane, he "didn't want to be there" or "be involved" because he was on probation for "stealing" and had "a couple of convictions for stealing[.]" After Kane learned that Eltahir died, however, he told the officers the truth. The officers showed a photograph array to Kane, who identified Ford as the person who stabbed Eltahir. Kane told officers that he was "a hundred percent" sure about his identification of Ford. Kane also identified Ford in court.

On cross-examination, Ford's counsel questioned Kane about Eltahir's reaction to Ford's statement about Eltahir's sister. Kane testified that Eltahir became upset, and that Eltahir and Ford eventually started "pushing back and forth." Kane denied, however, that Eltahir "jump[ed] up" or "lunged at [] Ford[.]"

As a witness for the State, Brown testified that she used to date Ford, but they had broken up approximately seven or eight months before July 2015. On the evening of July 8, 2015, Ford arrived at Brown's home unannounced, and asked Brown for a favor. Ford asked if he could stay at Brown's home "for a while because he said that he had got[ten] into a confrontation with a friend of his, or something. And the friend hit him in his head, and he stabbed him." Brown asked Ford why he did not wait for law enforcement, and Ford replied that "he was afraid, he didn't want to get into that[,]" and that he "was scared" of "[t]he police with all the drama with -- because the guy had hit him first, or something,

- 12 -

and he had stabbed him." Ford told Brown that he had learned that Eltahir had died. Ford also told Brown that he had made a comment to Eltahir about "having sex with" Eltahir's sister.

Ford told Brown that he had first stopped at his mother's house and "that's where he left the knife . . . [t]hat he had stabbed the boy with." Ford told Brown that he had left the knife "with the shed, behind the shed, or something" at his mother's house. Brown saw "a gash on [Ford]'s arm" and used peroxide and ointment on it. Ford told Brown that Eltahir had "stabbed him there[,]" although Ford did not say that he saw Eltahir with a knife—only that "they was struggling around." When Brown suggested that Ford go to a hospital, Ford "said no . . . [b]ecause they [were] going to lock him up."

The following morning, Brown advised Ford that he could not stay at her home and "that he had to go." The prosecutor then asked Brown: "What was [Ford's] reaction when you told him he could not stay?" Ford's counsel objected, and the circuit court initiated a bench conference, at which Ford's counsel argued that Ford's reaction was "completely irrelevant" and "more prejudicial than probative." The prosecutor responded that Ford's reaction went "to consciousness of guilt. He's wanting [Brown] to allow him to stay there, so that he can hide." The prosecutor explained:

> Consciousness of guilt, his reaction, you are not allowed to stay here, you have to get out, and he's very angry at her for doing that. I think it goes to -
> - I think it's probative as to how he's acting and conducting himself after this. He's running, he's hiding, and he's now really angry when they ask him to leave.

The circuit court overruled the objection, telling the prosecutor: "Okay. You are allowed to (inaudible few words). But [do] not go into any (inaudible word)." The prosecutor

- 13 -

stated: "I have stayed away from the whole temper thing, based on what the Court has said so far, and I'm not going to ask her anything about his reputation or any of that, just what he did that morning."

Brown's testimony resumed, and the following exchange occurred:

[PROSECUTOR:] So you told him he had to leave about seven a.m., what was his reaction to that? When you told him he had to leave?

[BROWN:] I don't want to say what he said to me. He left.

[PROSECUTOR:] Could you -- no, we unfortunately need to use those words here, in the courtroom.

[BROWN:] He said (Expletive) you --

Ford's counsel objected, stating that the prosecutor's question was "formed differently than the previous question that [he] had objected to." The circuit court asked the prosecutor to "[r]e-ask [her] first question[,]" and the following exchange ensued:

[PROSECUTOR:] What was his reaction when you told him he had to leave?

[FORD'S COUNSEL]: And I would just for the purpose of the record renew my objection.

THE COURT: I understand that. Ma'am what was his reaction when you told him to leave, what was his reaction?

[BROWN]: I don't know what you want me -- to respond and say. To say what? He was upset? I don't know what you want. He was upset all night so -- that was just the icing on the cake.

[FORD'S COUNSEL]: I would object, I would object at this point. . . . And I would just ask the record to reflect that the witness is asking for guidance from the [prosecutor].

[BROWN]: No.

[FORD'S COUNSEL]: Who obviously is not providing any guidance.

THE COURT: No, no, no, stop, everybody.

[BROWN]: No.

THE COURT: Everybody, everybody make it simple. Ma'am, it's just a very simple question, okay, it's just a very simple question, if you can answer it. And if you can't answer it, indicate you can't. The question was, when you told him that he could not stay, what was his reaction?

[BROWN]: Am I supposed to tell you what he said, or what he did?

THE COURT: What he did, not what he said. . . . Tell me, that was the first question, what was his reaction.

[BROWN]: -- he cursed me out, and he slammed back the front door and left.

Brown testified that law enforcement "tackled [Ford] down out in the parking lot . . . [a]bout two, three minutes" later.

As a witness for the State, Detective William Ballard of the Fugitive Apprehension Unit of the Anne Arundel County Police Department testified that he was part of the team that apprehended Ford on July 9, 2015. After Ford was arrested and handcuffed, he was placed in Detective Ballard's unmarked vehicle. Detective Ballard sat with Ford in the vehicle while awaiting instructions on where to transport Ford. At that point, Ford had not been told the reason for his arrest. Detective Ballard did not ask Ford any questions while the two were in the vehicle, but Ford made statements. Over Ford's counsel's objection, Detective Ballard testified that, as detectives were approaching Brown's home, Ford "said that they had nothing to do with this." Detective Ballard advised Ford that the detectives "just needed to identify the residence for further investigation, or something[,]" to which Ford responded "he did not want them to lose their house and that there was nothing in

there, or something like that." Ford also "said that he hid it in the county."

While Ford was being transported, he "continued to make statements," telling Detective Ballard "that he cut me. He . . . motioned to his -- I believe it was his right arm -- which was a bandage on his right arm." Ford also asked Detective Ballard: "[H]ow's he doing?" Detective Ballard advised Ford that he did not know anything about the case and that other detectives would speak with Ford shortly. "[A]t that point[, Ford] began to ask [] more questions[,]" so Detective Ballard advised Ford of his rights, and Ford made no further statements about the incident.

As a witness for the State, Detective Kelly Harding of the Anne Arundel County Police Department testified that she was the lead detective in the investigation of Eltahir's homicide. Detective Harding identified Ford as a potential suspect because McQueen and Kane identified him in photographic arrays. After Ford was arrested, Detective Harding advised Ford of his rights, and she and her partner, Detective Jason McNemar, interviewed Ford.

Parts of Detective Harding's and Detective McNemar's interrogation of Ford were played for the jury, and, over Ford's counsel's objections, the circuit court admitted the recording and transcript of the interrogation. During the interrogation, Ford advised the detectives that he "cut" Eltahir and the following exchanges occurred:

> [DETECTIVE HARDING]: And so we'd like to kind of hear your side of - of what exactly he said and - and - and what happened.
>
> [FORD]: You know what, it happened so fast, I'm being honest, I don't even remember.
>
> [DETECTIVE HARDING]: You don't remember what he said?

[FORD]: I have no idea.  I - I know he hit me.

[DETECTIVE HARDING]: Okay, where did he hit you?

[FORD]: And I'm 59 years old.  I'm 58 years old, he hit me in my face.  In my jaw.

* * *

[DETECTIVE HARDING]: Why?  Why, do you remember why?

[FORD]: Yeah, 'cause I don't know, it was something about - it some girls walking by and I mentioned they, his culture.  They looked like his sisters. And he said, "You talking about my sisters like that?"  And I said, "Don't - you getting all offensive but you sleeping with them?"  Like and - and he went off.  He jumped up, he clocked me, that's it.

[DETECTIVE HARDING]: And then what happened?

[FORD]: That was it.  That's it.

[DETECTIVE HARDING]: And he hit you?

[FORD]: Yeah.

[DETECTIVE MCNEMAR]: And then what happened after he hit you?

[FORD]: That's when I told him, "You done messed up," and I cut him.

[DETECTIVE HARDING]: You cut him?  Do you remember where you cut him?

[FORD]: No. . . . I'm telling you, I don't even, I don't remember.  It happened so fast, I don't.

* * *

[DETECTIVE HARDING]: So how did you get this cut on your arm?

[FORD]: From him.  I don't remember what he cut me with.  He cut me with something, I don't know if he had a knife or what.  I told you, I don't remember. . . . This thing happened so fast, I still don't remember.  I'm not

- 17 -

even seeing it.  I just remember seeing the blood on him and him saying, "You cut me.  You f[***]ing cut me, you f[***]ing cut me."  You know, I heard him say that, that was it.

* * *

[DETECTIVE HARDING]: Okay.  So what did you do with the knife that cut him?

[FORD]: I hid it. . . . It's down on . . . my mother's property.

* * *

[DETECTIVE HARDING]: Is it, does it have a color handle?

[FORD]: Yeah, it's got a blue handle.

[DETECTIVE HARDING]: A blue handle?  So when he punched you did - did he knock you out or anything like that?

[FORD]: No, it just hurt me and I went to swing and that's all I remember.

Detective Harding testified that she arranged for law enforcement to go to Ford's mother's property to recover the knife that he hid.

As a witness for the State, Emilie Dembia, a forensic chemist at the Anne Arundel County Police Department's crime laboratory, was accepted as an expert in forensic serology and DNA analysis.  Dembia testified that she obtained DNA profiles for Ford and Eltahir, and compared those profiles with ones that were obtained from various items of evidence.  Dembia took three different samples from the knife—"a sample from the handle," "a sample from a stain on the blade of the knife," and "a sample from around the stained areas on the blade of the knife."  Dembia testified that "a major component of" the sample from the handle was consistent with Ford's known DNA profile, "Eltahir was excluded as the source of that major component[,]" and "[t]he minor component . . . was

- 18 -

too limited to make any conclusions about." Dembia testified that the "DNA profile from the stain on the blade and from the blade matche[d] the known DNA profile of [] Eltahir" and "Ford [was] excluded as the source of this DNA." Stated otherwise, the sample from the handle of the knife matched Ford's DNA profile, and the samples from the blade matched Eltahir's DNA profile. On cross-examination, Dembia acknowledged that there was not enough DNA on the knife's handle to be able to make any conclusions about the minor contributor. That meant that Dembia could not include or exclude Eltahir as the minor contributor with respect to the knife's handle.

As a witness for the State, Dr. John Stash, an Assistant Medical Examiner with the Office of the Chief Medical Examiner in Maryland, was accepted as an expert in forensic pathology. Dr. Stash testified that he oversaw the autopsy of Eltahir, who was "a well[-]developed, well[-]nourished male, six feet in height, 149 pounds." Eltahir "had a stab wound on the left side of [his] chest[,]" which was "consistent with a single-edged knife" and "approximately three-and-a-half inches" deep. Toxicology tests were run, and Eltahir tested positive for ethanol at "0.19 percent" in his heart and "0.25 percent" in his eye fluid. Dr. Stash concluded that Eltahir "would be intoxicated." Dr. Stash did not observe other injuries to Eltahir, such as cuts on his arms or hands or signs of bruising. Dr. Stash testified that the knife in evidence was consistent with the injury to Eltahir's chest. Dr. Stash opined to a reasonable degree of medical certainty that the cause of Eltahir's death was "a stab wound to the chest" and that the manner of death was homicide.

After the State rested its case, Ford's counsel moved for judgment of acquittal as to carrying a weapon openly with intent to injure, arguing that the knife did "not meet the

statutory definition of a deadly and dangerous weapon[.]" The circuit court granted the motion for judgment of acquittal as to the count for carrying a weapon openly with intent to injure. Ford's counsel also made a motion for judgment of acquittal as to second-degree murder, which the circuit court denied. Ford was then advised of his right to testify, and he elected to remain silent. Ford rested without calling any witnesses, the circuit court instructed the jury, and counsel gave closing arguments.

Following closing arguments, the jury began its deliberations. The jury found Ford guilty of second-degree murder. On December 20, 2016, the circuit court sentenced Ford to twenty-five years' imprisonment, with all but twenty years suspended, followed by five years' probation.

Ford appealed. On December 20, 2017, in a reported opinion, the Court of Special Appeals affirmed Ford's conviction. See Ford v. State, 235 Md. App. 175, 204, 175 A.3d 860, 876 (2017). The Court of Special Appeals held that the circuit court properly admitted evidence of Eltahir's character for peacefulness, explaining:

> We hold that the circuit court reasonably allowed McQueen and Kane to testify to Eltahir's character for peacefulness in response to Ford's opening statement. . . . The reasonableness of the court's decision here is underscored by the three decisions discussed above . . . allowing trial courts to admit otherwise inadmissible evidence for the purpose of anticipatory rehabilitation and rebuttal. Because Maryland Rule 5-611(a) gives trial courts the discretion to allow anticipatory rehabilitation, it could reasonably be interpreted as providing trial courts the discretion to allow anticipatory rebuttal evidence under Maryland Rule 5-404(a)(2)(C). Such a conclusion would be consistent with the dicta [in one case], which would allow the anticipatory rebuttal of evidence referenced in an opening statement. Under these circumstances, we cannot say that the [circuit] court acted in an arbitrary or capricious manner. We hold, therefore, that the circuit court did not abuse its discretion in allowing McQueen and Kane to testify to Eltahir's character for peacefulness.

Id. at 194, 195-96, 175 A.3d at 871-72 (cleaned up). The Court of Special Appeals also held that the circuit court did not abuse its discretion in permitting Brown to testify about Ford's reaction to being told that he had to leave her home, determining that "Brown's testimony was admissible to show Ford's guilty state of mind"—*i.e.*, consciousness of guilt—and that "the circuit court did not abuse its discretion in concluding that the probative value of the testimony outweighed the risk of undue prejudice and considerations of cumulative evidence." Ford, 235 Md. App. at 196, 175 A.3d at 872.

On February 8, 2018, Ford petitioned for a writ of *certiorari*, raising the following three issues:

> 1.    Under Maryland Rule 5-404(a)(2)(C), which provides, "In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor," is the State allowed to present evidence of the alleged victim's trait of peacefulness, in its case[-]in[-]chief, to rebut opening statements by defense counsel that the defendant was not the aggressor and acted in self-defense?
>
> 2.    What is the correct standard for determining whether a defendant's conduct is too ambiguous or equivocal to be admissible as evidence of "consciousness of guilt"?
>
> 3.    Where the State was permitted to elicit testimony that [Ford] went to the house of a witness after he stabbed the victim, that when the witness asked him to leave [Ford] "slammed" the door and "cursed" out the witness, that [Ford] also told the witness, *inter alia*, that he left the scene of the stabbing because he was "scared" of the "police" and that he did not think there was a self-defense law in Maryland, and where the [prosecutor] in closing argument contrasted [Ford]'s reaction to being asked to leave, during which he "raged around," with the "easy[]going" nature of the victim, inviting an "improper inference," according to the Court of Special Appeals, did the [circuit] court err in admitting the witness's testimony regarding [Ford]'s reaction to being asked to leave as evidence of "consciousness of

guilt"?[1]

On April 9, 2018, this Court granted the petition. See Ford v. State, 458 Md. 580, 183 A.3d 156 (2018).

## DISCUSSION

### I. Evidence of the Alleged Victim's Trait of Peacefulness

### The Parties' Contentions

Ford contends that the circuit court erred in allowing the State to present evidence of Eltahir's trait of peacefulness in its case-in-chief—through testimony by McQueen and Kane—to rebut statements made by Ford's counsel in opening statement that Ford was not the aggressor and acted in self-defense. Ford argues that, under the plain language of Maryland Rule 5-404(a)(2)(C), opening statements are not "evidence," and a prosecutor may only "rebut" evidence that the defendant offers. Ford asserts that the plain meaning of the term "evidence" excludes statements counsel makes during an opening statement, *i.e.*, that opening statements do not constitute evidence. Ford maintains that the plain meaning of "rebuttal evidence" is "[e]vidence offered to disprove or contradict the evidence presented by an opposing party[,]" and that rebuttal evidence of a victim's character trait for peacefulness is permitted only after the defendant introduces evidence that the victim was the first aggressor. (Cleaned up).

Ford contends that the "default policy" underlying Maryland Rule 5-404(a) is to exclude character evidence, and that Maryland Rule 5-404(a)(2)(C), as an exception to that

---

[1]We consolidate the second and third issues, consistent with the manner in which the parties address the issues.

general rule, should be narrowly construed. Ford argues that narrowly construing Maryland Rule 5-404(a)(2)(C) is consistent with a plain language reading of the subsection, "such that 'evidence' is not [to] be read broadly to include opening statements and 'rebut' is not to be read broadly[.]" Ford asserts that the circuit court's error in permitting the State to offer evidence of Eltahir's character trait for peacefulness was not harmless because the prosecutor emphasized Eltahir's peacefulness during the State's closing argument.

The State responds that the circuit court properly permitted it to introduce evidence in its case-in-chief of Eltahir's trait of peacefulness because Ford's counsel stated during his opening statement that Eltahir was the aggressor and signaled that evidence would be introduced to prove as much. The State contends that the circuit court had the discretion "to vary the order of proof established by [Maryland] Rule 5-404(a)(2)(C)" to permit the State to offer rebuttal evidence in its case-in-chief where Ford's opening statement opened the door to such evidence. The State argues that Ford's counsel placed Eltahir's action and character at issue in his opening statement.

The State maintains that, pursuant to Maryland Rule 5-611, the circuit court had the authority to control the order of the presentation of evidence to, among other things, avoid the needless consumption of time. The State contends that case law establishes that the State's case-in-chief may include rebuttal evidence if the defense opens the door during opening statement or on cross-examination of a State's witness. The State argues that case law also recognizes that an opening statement may open the door to certain evidence that would otherwise be inadmissible at trial. The State asserts that, in any event, any error was harmless beyond a reasonable doubt because self-defense was not generated.

- 23 -

## Standard of Review

Generally, an appellate court reviews for abuse of discretion a trial court's admission of evidence. <u>See</u> <u>Thomas v. State</u>, 397 Md. 557, 579, 919 A.2d 49, 62 (2007) (citation omitted). A trial court abuses its discretion in admitting evidence that is inadmissible under a Maryland Rule. <u>See</u> <u>id.</u> at 579, 919 A.2d at 62. An appellate court reviews without deference a trial court's interpretation of a Maryland Rule. <u>See</u> <u>Davis v. Slater</u>, 383 Md. 599, 604, 861 A.2d 78, 80-81 (2004).

## Maryland Rule 5-404(a)

Maryland Rule 5-404(a), concerning character evidence generally, provides:

**(a) Character evidence.** (1) Prohibited uses. Subject to subsections (a)(2) and (3) of this Rule, evidence of a person's character or character trait is not admissible to prove that the person acted in accordance with the character or trait on a particular occasion.

(2) Criminal and delinquency cases. Subsection (a)(2) of this Rule applies in a criminal case and in a delinquency case. For purposes of subsection (a)(2), "accused" means a defendant in a criminal case and an individual alleged to be delinquent in an action in juvenile court, and "crime" includes a delinquent act as defined by Code, Courts Article, § 3-8A-01.

(A) Character of accused. An accused may offer evidence of the accused's pertinent trait of character. If the evidence is admitted, the prosecution may offer evidence to rebut it.

(B) Character of victim. Subject to the limitations in Rule 5-412, an accused may offer evidence of an alleged crime victim's pertinent trait of character. If the evidence is admitted, the prosecutor may offer evidence to rebut it.

(C) Homicide case. In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

(3) Character of witness. Evidence of the character of a witness with

regard to credibility may be admitted under Rules 5-607, 5-608, and 5-609.

Thus, the general rule under Maryland Rule 5-404(a)(1) is that "evidence of an individual's character or character trait is inadmissible to prove that[,] on a particular occasion, that individual acted in accordance with that character trait." Williams v. State, 457 Md. 551, 564, 179 A.3d 1006, 1014 (2018) (citation omitted). Maryland Rule 5-404(a)(2), however, sets forth three exceptions to that general rule of inadmissibility. See id. at 564, 179 A.3d at 1014 (This Court referred to Maryland Rule 5-404(a)(2)(A) as providing a "commonly known caveat to the general rule[.]").

**Analysis**

Here, we hold that Maryland Rule 5-404(a)(2)(C) does not permit a prosecutor to offer evidence of an alleged victim's trait of peacefulness to rebut statements made by defense counsel in opening statement because opening statements are not evidence, and Maryland Rule 5-404(a)(2)(C) specifically requires that "**evidence** that the victim was the first aggressor" be introduced before the prosecutor may rebut such evidence with "evidence of the alleged victim's trait of peacefulness[.]" (Emphasis added). Ford's counsel's remarks during opening statement did not "open the door" for the prosecutor to present evidence of Eltahir's trait of peacefulness. This is so because, even if Ford's counsel's remarks placed Eltahir's actions and character at issue and somehow indicated that Ford would perhaps offer evidence to prove that Eltahir was the aggressor, Maryland Rule 5-404(a)(2)(C) definitively requires evidence that the victim was the first aggressor— not merely a statement indicating that some evidence might possibly be introduced—to trigger the State's ability to rebut with evidence of the victim's trait of peacefulness.

Accordingly, the circuit court erred in concluding that Ford's counsel had "opened the door" for the State to present evidence of Eltahir's trait of peacefulness, and in permitting the State, over Ford's objection, to elicit testimony in its case-in-chief from McQueen that Eltahir was a "quiet, nice person[, n]ice to everybody[,]" and from Kane that Eltahir "was a cool person[, h]e was never, you know nasty or hostile, or anything." Nonetheless, we conclude that the error was harmless beyond a reasonable doubt.

We begin by examining the plain language of Maryland Rule 5-404(a)(2)(C), which simply provides that, in homicide cases, "the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." Maryland Rule 5-404(a) does not define the word "evidence" as used in Maryland Rule 5-404(a)(2)(C), and, specifically, does not indicate whether "evidence" includes opening statements for purposes of the Rule. Nor does Maryland Rule 5-404(a) provide the meaning of the word "rebut." Under these circumstances, it is appropriate to turn to the "natural and ordinary meaning" of the terms "evidence," "rebut," and "rebuttal evidence." Wagner v. State, 445 Md. 404, 417, 128 A.3d 1, 9 (2015) (citation omitted). To ascertain the natural and ordinary meaning of the terms, we look to dictionary definitions as a starting point. See, e.g., Chow v. State, 393 Md. 431, 445, 903 A.2d 388, 396 (2006) ("[I]t is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning." (Citations omitted)).

Black's Law Dictionary defines "evidence," in relevant part, as follows:

1. Something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact <the

bloody glove is the key piece of evidence for the prosecution>. 2. See *fact in evidence* under FACT. 3. The collective mass of things, esp[ecially] testimony and exhibits, presented before a tribunal in a given dispute <the evidence will show that the defendant breached the contract>.

Evidence, Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "evidence," in pertinent part, as:

something that furnishes proof: TESTIMONY

*specifically*: something legally submitted to a tribunal to ascertain the truth of a matter[.]

. . .

something that furnishes or tends to furnish proof

*especially*: something (as testimony, writings, or objects) presented at a judicial or administrative proceeding for the purpose of establishing the truth or falsity of an alleged matter of fact[.]

Evidence, Merriam-Webster (2018), https://www.merriam-webster.com/dictionary/evidence [https://perma.cc/F2UP-RTYN].

These definitions demonstrate that the term "evidence" means testimony, documents, objects, or exhibits that are offered during a judicial proceeding to prove or disprove the existence of an alleged fact; *i.e.*, evidence is something that is submitted to a tribunal, in one of various forms, that tends to establish the truth or falsity of an alleged fact. Thus, utilizing the ordinary definition of "evidence," it is clear that opening statements do not constitute evidence. Notably, the definitions of "evidence" do not identify an opening statement as an example of "evidence"; rather, the definitions identify testimony, writings/documents, objects, and exhibits as types of "evidence." Put simply, the term "evidence"—although encompassing a wide variety of things, such as testimony,

documents, or objects that are offered to prove or disprove the existence of an alleged fact—does not encompass assertions that are made during opening statements. Such statements do not, and are not, given to prove or disprove the existence of an alleged fact, but instead are made to provide the fact-finder with a party's overview of the case and a preview of the evidence that is to be presented at trial.

> Black's Law Dictionary defines "opening statement" as follows:
>
> At the outset of a trial, an advocate's statement giving the fact-finder a preview of the case and of the evidence to be presented. [] Although the opening statement is not supposed to be argumentative, lawyers — purposefully or not — often include some form of argument. The term is thus sometimes referred to as *opening argument*. — Also termed *opening address*.

Opening Statement, Black's Law Dictionary (10th ed. 2014). And, Merriam-Webster provides, in pertinent part, the following legal definition of "opening statement": "a statement to the jury by trial counsel before the presentation of evidence that usually explains the nature of the case, the factual matters to be proven, and the evidence to be presented and that summarizes the arguments to be made[.]" Opening Statement, Merriam-Webster (2018), https://www.merriam-webster.com/legal/opening%20statement [https://perma.cc/CW3U-N6V8]. It is clear that an "opening statement" is a statement by counsel made at the beginning of a trial, before the presentation of evidence, in which counsel usually provides the fact-finder with an outline of the case, the evidence that is to be presented, and the arguments that are to be made. In other words, an opening statement is not itself evidence, as it is given prior to the presentation of evidence, and often includes a preview of the evidence that counsel expects to present during trial.

Additionally, consistent with the plain meaning of the terms "evidence" and "opening statement," this Court has long concluded that opening statements are not evidence. See, e.g., Keller v. Serio, 437 Md. 277, 288, 85 A.3d 283, 289 (2014) ("[O]pening statements are not evidence[.]" (Citation omitted)). Because it is well established that opening statements are not evidence, the Maryland Criminal and Civil Pattern Jury Instructions state as much. See MPJI-Cr 3:00 ("Opening statements and closing arguments of lawyers are not evidence. They are intended only to help you to understand the evidence and to apply the law."); MPJI-Cv 1:7 (same).

Black's Law Dictionary defines the term "rebut" as "[t]o refute, oppose, or counteract (something) by evidence, argument, or contrary proof <rebut the opponent's expert testimony> <rebut a presumption of negligence>." Rebut, Black's Law Dictionary (10th ed. 2014). And, Black's Law Dictionary defines "rebuttal evidence" as "[e]vidence [that is] offered to disprove or contradict the evidence [that is] presented by an opposing party[,]" and states "[r]ebuttal evidence is introduced in the rebutting party's answering case; it is not adduced, e.g., through cross-examination[,] during the case-in-chief of the party [that is] to be rebutted." Rebuttal Evidence, Black's Law Dictionary (10th ed. 2014). "Rebuttal evidence" is also defined as "evidence that tends to refute or discredit an opponent's evidence[.]" Rebuttal Evidence, Merriam-Webster (2018), https://www. merriam-webster.com/dictionary/evidence [https://perma.cc/F2UP-RTYN]. These definitions demonstrate that the very concept of rebuttal evidence is to disprove or contradict evidence that was presented by the opposing party; i.e., there must first be evidence offered by one party before the other party may rebut it through rebuttal evidence.

Thus, the plain language of Maryland Rule 5-404(a)(2)(C) makes clear that a prosecutor is not permitted to offer evidence of an alleged victim's trait of peacefulness to rebut statements that defense counsel makes during an opening statement. Rather, under the plain language of Maryland Rule 5-404(a)(2)(C), there must first be evidence presented by the defense that the victim was the aggressor before a prosecutor may offer rebuttal evidence of the alleged victim's trait of peacefulness. Stated otherwise, it is only the introduction of evidence by the defense that can open the door for a prosecutor in a homicide case to introduce evidence of the victim's trait of peacefulness. To interpret "evidence" to include "opening statement" would contradict the plain language of Maryland Rule 5-404(a)(2)(C), and the plain meaning of the words. Nothing whatsoever in Maryland Rule 5-404(a) indicates that "evidence" includes opening statements.

Although the plain language of Maryland Rule 5-404(a)(2)(C) is unambiguous, we briefly look to the history and purpose of the Rule, which confirms that, under Maryland Rule 5-404(a), a defendant must first offer evidence of the victim's pertinent character trait—not make assertions during an opening statement—to open the door for the State to rebut that evidence. Title 5 of the Maryland Rules, entitled "Evidence," became effective on July 1, 1994. See Sessoms v. State, 357 Md. 274, 285, 744 A.2d 9, 15 (2000). As originally adopted, Maryland Rule 5-404(a)(2)(C) was part of Maryland Rule 5-404(a)(1)(B), which provided, in pertinent part, as follows:

(a) **Character evidence generally**. (1) In general. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: . . . (B) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same,

- 30 -

or **evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor**[.]

Md. R. 5-404 (1994) (emphasis added) (paragraph breaks omitted).

In 2010, this Court adopted amendments to Maryland Rule 5-404(a), resulting in the current structure of Maryland Rule 5-404(a)(2)(A) through (C). See Court of Appeals of Maryland, Rules Order at 9 (Oct. 20, 2010), available at https://www.mdcourts.gov/ sites/default/files/rules/order/ro165.pdf [https://perma.cc/N9L5-YA95]. On April 16, 2010, prior to the Rule's amendment, the Standing Committee on Rules of Practice and Procedure conducted a meeting, at which Professor Lynn McLain described Maryland Rule 5-404(a) as follows:

> As the current Rule exists, there are two separate boxes, one for the victim's character and one for the accused's character. It is up to the defendant to open up either one of those issues. **If the defendant offers evidence of the victim's pertinent character traits, that opens the door to the prosecution to rebut that evidence**, but only the evidence of the victim's pertinent character traits.

Minutes of the Standing Committee on Rules of Practice and Procedure, Apr. 16, 2010, at 30 (emphasis added). Stated otherwise, the defendant controls the introduction of character evidence by offering such evidence in the first instance; *i.e.*, it is character evidence being offered by the defendant—not an assertion made during opening statement—that triggers or opens the door for the State to rebut that evidence under Maryland Rule 5-404(a).

Here, there was simply no evidence offered by Ford that Eltahir was the aggressor, thereby triggering the State's ability to offer evidence of Eltahir's trait of peacefulness under Maryland Rule 5-404(a)(2)(C). Instead, during opening statement, Ford's counsel

set forth the defense's theory of the case—self-defense—and stated, among other things, that: Eltahir was "younger[,]" "faster[,]" "bigger[,]" "and stronger than [] Ford"; Eltahir, not Ford, was "the person [who] initiate[d] any physical contact"; Ford was "reacting out of fear, and [] he certainly wasn't the aggressor"; and Ford "made an offhand verbal comment but he was not the physical aggressor." That Ford's counsel asserted in opening statement that Eltahir was the aggressor is wholly consistent with Ford claiming perfect self-defense, which requires satisfaction of four elements, including that "[t]he accused claiming the right of self-defense must not have been the aggressor or provoked the conflict[.]" Porter v. State, 455 Md. 220, 234-35, 166 A.3d 1044, 1053 (2017) (citation omitted). Despite Ford's counsel's assertions during opening statement that Ford was not the aggressor and that he did not initiate physical contact, those assertions did not constitute evidence that Eltahir was the first aggressor for the simple reason that opening statements are not evidence. Stated otherwise, there was no evidence that Eltahir was the aggressor, and, thus, Maryland Rule 5-404(a)(2)(C) was not triggered; *i.e.*, the prosecutor could not offer evidence of Eltahir's trait of peacefulness.

Indeed, the State recognizes that opening statements are not evidence. The State contends, however, that Ford's counsel's remarks during opening statement nevertheless opened the door to the State being entitled to rebut those claims in its case-in-chief. We disagree. In support of its contention, the State relies on a variety of cases, none of which involved admission of rebuttal character evidence under Maryland Rule 5-404(a). For example, in Snyder v. State, 361 Md. 580, 586, 601-02, 762 A.2d 125, 128-29, 137 (2000), this Court stated in *dicta*, "for the guidance of the trial court on remand[,]" that the trial

court had not erred in allowing the State to introduce testimony that, seven months before a murder, the defendant and the victim (his wife) had a physical dispute, and that, at some point during the marriage, the defendant hit his wife. We determined that such evidence was admissible under Maryland Rule 5-404(b), which governs other crimes and prior bad acts evidence, to demonstrate motive. See id. at 602, 611, 762 A.2d at 137, 142. In so determining, we stated:

> [E]ven if we agreed with the [defendant] that such acts are not admissible to prove motive, evidence that the [defendant] hit his wife, as well as evidence of more specific physical disputes, are admissible as rebuttal evidence. In this case, the [defendant]'s attorney during opening statement reiterated the [defendant]'s sworn statement to the police that the [defendant]'s relationship with his wife was "great and getting better," suggesting that it was improbable that the [defendant] murdered his wife. The State was entitled to rebut that evidence.

Id. at 611, 762 A.2d at 142.

As an initial matter, our statement in Snyder that the defendant had essentially opened the door through his counsel's opening statement to evidence of his relationship with his wife as proof of motive was *dicta* and has no precedential value. Second, in Snyder, we did not address whether, let alone hold that, remarks during counsel's opening statement may open the door for introduction of rebuttal character evidence under Maryland Rule 5-404(a). Significantly, Maryland Rule 5-404(b) is materially different from Maryland Rule 5-404(a)(2)(C), and provides:

> Evidence of other crimes, wrongs, or acts including delinquent acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

By its plain language, Maryland Rule 5-404(b), unlike Maryland Rule 5-404(a)(2)(C), does not depend on the defendant first offering evidence to trigger the State's ability to introduce certain evidence and does not concern rebuttal evidence. Thus, the *dicta* in Snyder simply is not applicable in interpreting Maryland Rule 5-404(a)(2)(C).

Similarly, we are unpersuaded by the State's reliance on Hopkins v. State, 137 Md. App. 200, 207-08, 768 A.2d 89, 93-94 (2001), and Fullbright v. State, 168 Md. App. 168, 182-85, 895 A.2d 1088, 1096-97, cert. denied, 393 Md. 477, 903 A.2d 416 (2006), which involved admission of anticipatory rehabilitation evidence of a State's witness under Maryland Rule 5-616(c), during direct-examination of the witness, in response to remarks made by the defendants' counsel during opening statements. Notably, Maryland Rule 5-616(c) provides that "[a] witness whose credibility has been attacked may be rehabilitated" through one of four different ways. Significantly, Maryland Rule 5-616(c)'s use of the word "attacked" is much broader than Maryland Rule 5-404(a)(2)(C)'s reference to "rebut evidence[,]" and arguably could encompass remarks that counsel makes during an opening statement that "attack" a witness's credibility. In any event, neither Hopkins nor Fullbright addressed Maryland Rule 5-404(a)(2)(C), or whether opening statements may open the door for the State to present rebuttal evidence of an alleged victim's trait of peacefulness in its case-in-chief. Simply put, Snyder, Hopkins, and Fullbright do not support the position that remarks by defense counsel during opening statement can trigger Maryland

Rule 5-404(a)(2)(C).[2]

Likewise, we are unpersuaded by the State's reliance on Terry v. State, 332 Md. 329, 631 A.2d 424 (1993), Martin v. State, 364 Md. 692, 775 A.2d 385 (2001), and Johnson v. State, 408 Md. 204, 969 A.2d 262 (2009) for the contention that the State's case-in-chief may include rebuttal evidence to which the defense has opened the door through opening statement. These cases are inapposite, and do not involve Maryland Rule 5-404(a)(2)(C).

---

[2]We find no merit in the State's reliance on Anderson v. State, 420 Md. 554, 24 A.3d 692 (2011) and Thomas v. State, 429 Md. 85, 55 A.3d 10 (2012) for the proposition that remarks during opening statement may open the door for evidence that would otherwise be inadmissible. In Anderson, 420 Md. at 566-67, 24 A.3d at 699, this Court addressed admission of a witness's prior consistent statement under Maryland Rules 5-802.1(b) and 5-616(c), and noted those Rules "become applicable only if the defendant's opening statement and/or cross-examination of a State's witness has opened the door to evidence that is relevant (and now admissible) for the purpose of rehabilitation." (Cleaned up). Thomas, 429 Md. at 97, 55 A.3d at 16-17, involved admission of a witness's prior consistent statement pursuant to Maryland Rule 5-616(c) to rehabilitate the witness's credibility, and this Court quoted the above language in Anderson. As explained above, Maryland Rule 5-616(c)'s use of the word "attacked" clearly encompasses remarks by defense counsel during opening statement, and is thus broader than the language in Maryland Rule 5-404(a)(2)(C). And, Maryland Rule 5-802.1(b) provides, in pertinent part:

> The following statements previously made by a witness who testifies at the trial . . . and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: . . . A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive.

(Paragraph break omitted). Like the word "attacked" in Maryland Rule 5-616(c), the term "to rebut an express or implied charge" in Maryland Rule 5-802.1(b) contemplates remarks made by counsel during opening statement, as counsel could, during opening statement, set forth an express or implied charge of fabrication or improper influence or motive. In other words, Maryland Rules 5-616(c) and 5-802.1(b) arguably extend to opening statements as a trigger for admission of evidence. Indeed, neither Maryland Rule 5-616(c) nor Maryland Rule 5-802.1(b) ties the triggering of admission of evidence to "evidence" having already been admitted, as Maryland Rule 5-404(a)(2)(C) does.

In Terry, 332 Md. at 338-39, 631 A.2d at 428-29, this Court concluded that a trial court erred in admitting evidence of the defendant's prior conviction, after remarks made by the defendant's counsel in opening statement. In so holding, we discussed the doctrine of curative admissibility and opening the door, and stated that, "[w]hen explanatory or curative evidence is admissible under either the 'open door' or 'curative admissibility' doctrine, the remedy must be proportionate to the malady." Id. at 338, 631 A.2d at 428. In Martin, 364 Md. at 708-09, 775 A.2d at 394-95, this Court concluded that a trial court erred in admitting evidence of the defendant's consultation with an attorney to rebut an assertion made by defense counsel in opening statement because the danger of unfair prejudice "substantially outweighed any probative value[.]" In so holding, we explained that "[t]he doctrine of curative admissibility permits otherwise irrelevant evidence to be admitted in response to an adverse ruling or action[,]" and noted that, although "comments made in opening statements are not evidence . . . , the general principles in allowing a party to 'meet fire with fire' are applicable." Id. at 708, 775 A.2d at 394 (cleaned up). Nevertheless, we explained that "[t]his doctrine of expanded relevance has its limits . . . as the remedy must be proportionate to the malady." Id. at 708, 775 A.2d at 394 (cleaned up).

In Johnson, 408 Md. at 223-24, 969 A.2d at 273, this Court held that the trial court should have sustained the defendant's objection to the following question by the prosecutor: "And some people believe that most of the currency in general circulation is contaminated with drug residue and that therefore [a] canine will always alert to currency, even currency in a bank. Based on your test of currency drawn from a bank, was that a legitimate belief?" (Cleaned up). As one reason why this question was objectionable, we

explained:

> [T]he question was unfairly prejudicial because it violated the rule against the introduction of "anticipatory rehabilitation" and/or "strawman rebuttal" evidence. Under this rule, unless the defendant's opening statement and/or cross-examination of a State's witness has "opened the door" to evidence that is relevant (and now admissible) for the purpose of either rehabilitation or rebuttal, the State is prohibited from introducing during its case-in-chief—and thereafter rebutting—such evidence in order to "bolster" that witness's testimony. Because this rule applies to expert testimony as well as to non-expert testimony, the [trial c]ourt should have prohibited the State from bolstering [an officer]'s testimony about the significance of the canine scan.

Id. at 226, 969 A.2d at 274-75 (cleaned up). Importantly, in Terry, Martin, and Johnson, this Court did not conclude that the doctrine of curative admissibility, or opening the door, applied generally to character evidence under Maryland Rule 5-404(a) or specifically to rebuttal character evidence of a victim's trait of peacefulness under Maryland Rule 5-404(a)(2)(C). Indeed, none of these cases involved admission of character evidence pursuant to Maryland Rule 5-404(a) and, thus, they are unpersuasive.

Nor are we convinced that Maryland Rule 5-611(a) somehow changes the result or otherwise authorizes a trial court to permit the State to introduce evidence of the alleged victim's trait of peacefulness, pursuant to Maryland Rule 5-404(a)(2)(C), in its case-in-chief in response to remarks by defense counsel in opening statement. Maryland Rule 5-611(a) provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." To be sure, Maryland Rule 5-611(a) generally authorizes a trial court to vary the order of proof, and,

specifically, the order of interrogating witnesses and presenting evidence. Nothing in Maryland Rule 5-611(a), however, indicates that the provision overrides the specific dictates of Maryland Rule 5-404(a)(2)(C), which creates a narrow exception to the general rule of inadmissibility of character evidence to prove that an individual acted in accordance with that character on a particular occasion. Indeed, Maryland Rule 5-611(a) does not purport to expand a trial court's discretion to permit the State to present rebuttal evidence of an alleged victim's trait of peacefulness in the State's case-in-chief due to remarks made by defense counsel in opening statement. Clearly, whatever discretion is afforded to the trial court in the admission of rebuttal character evidence, that discretion must be exercised within the limits set forth in Maryland Rule 5-404(a)(2)(C).

Having established that the circuit court erred in concluding that Ford's counsel had "opened the door" for the State to present evidence of Eltahir's trait of peacefulness under Maryland Rule 5-404(a)(2)(C), and in permitting the State, over Ford's objection, to elicit testimony in its case-in-chief from McQueen and Kane concerning Eltahir's trait of peacefulness, we must next explore whether the error was harmless. In Green v. State, 456 Md. 97, 165, 171 A.3d 1162, 1201 (2017), we explained the doctrine of harmless error as follows:

> Under the doctrine of harmless error, an appellate court does not reverse a conviction based on a trial court's error or abuse of discretion where the appellate court is satisfied beyond a reasonable doubt that the trial court's error or abuse of discretion did not influence the verdict to the defendant's detriment. Hall v. State, 437 Md. 534, 540-41, 87 A.3d 1287, 1291 (2014) (quoting Perez v. State, 420 Md. 57, 66, 21 A.3d 1048, 1054 (2011)) (brackets omitted); see also Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

(Cleaned up). "The harmless error standard is highly favorable to the defendant, and the burden is on the State to show that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case." Perez, 420 Md. at 66, 21 A.3d at 1054 (cleaned up). In this case, we conclude that the circuit court's error was harmless beyond a reasonable doubt.

Here, there was a plethora of evidence adduced at trial demonstrating that Ford did not act in self-defense in fatally stabbing Eltahir, such that we are satisfied beyond a reasonable doubt that the circuit court's error was of no consequence with respect to the jury's verdict. Eyewitness testimony confirmed that Ford did not act in self-defense, and, even if believed, Ford's account does not establish the defense of self-defense. McQueen testified that Ford began an unprovoked verbal altercation with Eltahir, and that, after words were exchanged between Ford and Eltahir, Ford stood up and "got in [Eltahir]'s face." Ford initiated physical contact by hitting Eltahir, and Ford eventually hit Eltahir in the chest. McQueen saw Ford begin to start "hitting" Eltahir again, and then she noticed blood on Eltahir. Ford passed by McQueen, carrying a knife in his hand, with blood running down his arm. McQueen identified Ford from a photographic array as the person who stabbed Eltahir, and testified that there was no doubt in her mind that Ford stabbed Eltahir. On cross-examination, McQueen testified that she "did see" Ford stab Eltahir. And, on redirect-examination, McQueen testified that there was no blood on Eltahir's shirt when he arrived at the park bench, and that Ford was the only person to make physical contact with Eltahir's chest.

Kane testified that Ford instigated a verbal altercation with Eltahir, and he later saw

Ford and Eltahir engaging in a physical altercation, "pushing each other back and forth." At some point thereafter, Kane saw blood on Eltahir's shirt; there had been no blood on Eltahir's shirt before the physical altercation with Ford, and nobody other than Ford had touched Eltahir. Kane identified Ford from a photographic array as the person who stabbed Eltahir, and told officers that he was "a hundred percent" sure about his identification. Brown testified that, once Ford arrived at her home unannounced, and asked whether he could stay because "he had got[ten] into a confrontation with a friend of his, or something. And the friend hit him in his head, and he stabbed him." Ford told Brown he was afraid to go to the police "because the guy had hit him first, or something, and he had stabbed him." Ford told Brown he had stashed the knife "[t]hat he had stabbed the boy with" on his mother's property.

Detective Ballard testified that, after Ford was arrested and placed in the detective's unmarked vehicle, and without being told of the reason for his arrest, Ford made various unsolicited statements, including that the people in Brown's house "had nothing to do with this[,]" "that there was nothing in there," and "that he hid it in the county." Ford also asked Detective Ballard how Eltahir was doing. Additionally, parts of Detective Harding's and Detective McNemar's interrogation of Ford were played for the jury, and the circuit court admitted the recording and transcript into evidence. During the interrogation, Ford told detectives that he saw women walk by and said to Eltahir: "Don't – you getting all offensive but you sleeping with them?" Ford said that Eltahir then "jumped up" and "clocked" him, and that he said "[y]ou done messed up," and then he "cut" Eltahir. Ford told detectives that he "remember[ed] seeing the blood on [Eltahir] and him saying, 'You cut me. You

f[***]ing cut me, you f[***]ing cut me.'" When asked by Detective Harding what he did "with the knife that cut him[,]" Ford responded that he "hid it" on his "mother's property." Detective Harding also asked whether Eltahir had knocked Ford out "or anything like that[,]" and Ford answered: "No, it just hurt me and I went to swing and that's all I remember."

Detective Harding testified that she arranged for officers to go to Ford's mother's house to recover the knife that he had hidden. Dembia, the forensic chemist, took three different samples from the knife, and testified that a major component of the sample from the knife's handle was consistent with Ford's known DNA profile, and that the samples from the stain on the blade and the areas around the blade matched Eltahir's known DNA profile and excluded Ford as the source of the DNA.

Overall, the evidence adduced by the State included the following: two eyewitnesses—McQueen and Kane—who, among other things, saw the altercation between Ford and Eltahir, testified that Ford instigated the altercation, testified that Ford was the only person to have physical contact with Eltahir, and identified Ford from photographic arrays as the person who stabbed Eltahir; Brown's testimony that Ford told her that he had stabbed a man who had hit him and then hidden the knife on his mother's property; Detective Ballard's testimony that Ford had made unsolicited comments after being arrested, including a statement that he had "hid it" and a question about how Eltahir was doing; and, Dembia's testimony that a major contributor of a sample from the handle of knife that was recovered from Ford's mother's property matched Ford's DNA profile, and that samples from the blade matched Eltahir's DNA profile. Perhaps most

significantly, the recording and transcript of Ford's interview by detectives were admitted into evidence, and the jury heard and saw that Ford expressly admitted multiple times that he had "cut" Eltahir after Eltahir allegedly hit him. Tellingly, Ford acknowledged to the detectives that Eltahir's allegedly hitting him had not "knocked [him] out" but only hurt him. In other words, even if Ford's statements to the detectives are credited, Ford essentially admitted to using deadly force on Eltahir where Eltahir only hit him. Given the eyewitness accounts of the circumstances under which Ford stabbed Eltahir showing that Ford did not act in self-defense in stabbing Eltahir, and Ford's description of the events to detectives, we conclude that any error on the circuit court's part in admitting testimony from McQueen and Kane as to Eltahir's trait of peacefulness during the State's case-in-chief was harmless beyond a reasonable doubt.[3]

## II. Evidence of Consciousness of Guilt

### The Parties' Contentions

Ford contends that the circuit court erred in permitting Brown to testify about his reaction to being asked to leave her home as evidence of consciousness of guilt. Ford argues that evidence that he cursed at Brown and slammed a door is not evidence of consciousness of guilt and, thus, is inadmissible. Ford asserts that such evidence was "too ambiguous and equivocal to" constitute evidence of consciousness of guilt. Ford maintains

---

[3]We are aware that, during the State's closing argument, the prosecutor called the jury's attention to McQueen's and Kane's testimony concerning Eltahir's trait of peacefulness, stating: "McQueen and Kane told you a little bit about [Eltahir]. They described him as quiet. Kane was even able to say he was peaceful, that he was quiet, easy[]going kind of guy." Ford did not object. In any event, for the reasons discussed above, the circuit court's error was harmless beyond a reasonable doubt.

that the evidence was susceptible to multiple prejudicial interpretations, such as, for example, that "he had a character trait for hot-temperedness or aggressiveness," which would lead "the jury to infer that [he] acted in conformity with that trait when he stabbed Eltahir." Ford contends that, in eliciting Brown's testimony as consciousness of his guilt, the State presented inadmissible character evidence about him.

Ford argues that, even if his reaction were relevant, its probative value was outweighed by the danger of unfair prejudice and therefore inadmissible. Ford asserts that the danger of unfair prejudice was "obvious"—namely, that the jury would infer from his reaction to Brown that he was hot-tempered or aggressive and that he stabbed Eltahir in conformity with his temperament. Ford maintains that, to the extent that evidence of his reaction reflected a consciousness of guilt, such evidence was cumulative and outweighed by unfair prejudice.

The State responds that the circuit court properly permitted, as evidence of consciousness of guilt, Brown's testimony about Ford's reaction to being told that he had to leave Brown's home. The State contends that the testimony was relevant and that the danger of unfair prejudice did not substantially outweigh its probative value. The State argues that Brown's testimony was relevant to Ford's guilty state of mind, and that Ford's post-crime conduct satisfied four inferences that are necessary for evidence to be admissible as evidence of consciousness of guilt. The State asserts that, if there were an innocent explanation for his conduct—for example, he slammed the door and cursed because Brown's telling him to leave triggered hurt from the end of the relationship or because it was a result of side effects of medication—Ford could have argued those

- 43 -

explanations before the jury, but did not. The State maintains that, even if Ford had presented an innocent explanation contradicting the inference of guilt, such an explanation would go to the weight—not the admissibility—of the State's evidence.

The State contends that the circuit court did not abuse its discretion in determining that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The State asserts that Brown's testimony was both relevant and not reasonably likely to produce such an emotional response that the danger of unfair prejudice would substantially outweigh the probative value of the evidence.

## Standard of Review

An appellate court reviews without deference a trial court's conclusion as to whether evidence is relevant. See Santiago v. State, 458 Md. 140, 161, 181 A.3d 796, 808 (2018). An appellate court reviews for abuse of discretion a trial court's determination as to whether evidence is inadmissible under Maryland Rule 5-403. See id. at 161, 181 A.3d at 808.

## Relevant Law

Maryland Rule 5-401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pursuant to Maryland Rule 5-402, "[e]xcept as otherwise provided by constitutions, statutes, or the[ Maryland R]ules, or by decisional law not inconsistent with the[ Maryland R]ules, all relevant evidence is admissible. Evidence that is not relevant is not admissible." "Although relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. R. 5-403.

"[I]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under M[aryland] Rule 5-403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt." Decker v. State, 408 Md. 631, 640, 971 A.2d 268, 274 (2009) (cleaned up). In Decker, id. at 640, 971 A.2d at 274, we explained that evidence of consciousness of guilt "can take various forms, including flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence." (Cleaned up). In Decker, id. at 641, 971 A.2d at 274, we explained that "evidence need not be contemporaneous with the crime to be evidence of the defendant's consciousness of guilt." (Cleaned up). Additionally, in Decker, id. at 641, 971 A.2d at 274, we stated that any evidence contradicting an inference of guilt that is derived from such flight "does not render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such flight." (Cleaned up).

In Decker, id. at 641, 971 A.2d at 274, we elaborated on evidence of consciousness of guilt, stating:

> Consciousness of guilt evidence is considered relevant to the question of guilt because the particular behavior provides clues to the person's state of mind, and state of mind evidence is relevant because the commission of a crime can be expected to leave some mental traces on the criminal. Thus, by application of the accepted test in Maryland for ascertaining relevancy, guilty behavior should be admissible to prove guilt if we can say that the fact that the accused behaved in a particular way renders more probable the fact of his or her guilt.

As with other forms of circumstantial evidence, however, the probative value of guilty behavior depends upon the degree of confidence with which certain inferences may be drawn. There must be an evidentiary basis, either direct or circumstantial, to link the defendant's conduct to the consciousness of guilt inference.

(Cleaned up). To determine whether evidence of post-crime conduct may be admissible as consciousness of guilt where flight is concerned, this Court established the following test:

> Under that test, the probative value of the evidence depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

Id. at 642, 971 A.2d at 275 (cleaned up).

As one example, in Thomas v. State, 372 Md. 342, 356-58, 812 A.2d 1050, 1058-59 (2002) ("Thomas I"), this Court held that evidence of the defendant's refusal to submit to a blood test over three years after the victim was killed, absent evidence that he was told the test was related to the victim's death—i.e., that the defendant was aware that law enforcement wished to test his blood in connection with the murder investigation—was not admissible as evidence of consciousness of guilt. In so holding, we observed that the third inference—"from consciousness of guilt to consciousness of guilt concerning the crime charged"—was not satisfied. Id. at 354, 812 A.2d at 1057. We explained: "Knowledge that the person is suspected of the charged crime is important because the value of the conduct lies in the culprit's knowledge that he or she has committed the charged offense and in his or her fear of apprehension." Id. at 354, 812 A.2d at 1057. We further noted that, in some instances, "a defendant's conduct [had been held to be] too ambiguous and

- 46 -

equivocal to be admissible as evidence of consciousness of guilt"—for example, this Court had held that "evidence that the defendant failed to call the police to inquire about the status of the investigation, even for seven years, [was] too ambiguous and equivocal to support such inferences." Id. at 355, 812 A.2d at 1058 (cleaned up).

In Thomas I, id. at 356, 812 A.2d at 1058, we explained that the following four inferences would need to be drawn:

> (1) from his resistance to the blood test, a desire to conceal evidence; (2) from a desire to conceal evidence, a consciousness of guilt; (3) from a consciousness of guilt, a consciousness of guilt of the murder of [the victim]; and (4) from a consciousness of guilt of the murder of [the victim], actual guilt of the murder.

We determined that there was no evidence from which the jury could have drawn the third inference because "there was absolutely no evidence from which the jury could conclude that [the defendant] knew the blood sample was in any way connected to the [victim's] murder." Id. at 357, 812 A.2d at 1059. Accordingly, absent evidence from which the jury could draw the third inference, evidence of the defendant's refusal to submit to the blood test "lack[ed] probative value and was inadmissible." Id. at 358, 812 A.2d at 1059.

In Thomas v. State, 397 Md. 557, 561, 919 A.2d 49, 52 (2007) ("Thomas II"), this Court "revisit[ed] the question of whether [the defendant]'s refusal to provide a blood sample demanded by police pursuant to a search warrant was admissible in evidence as consciousness of guilt." In Thomas II, id. at 577, 919 A.2d at 61, we held that there was a sufficient basis for the trial court to admit evidence of the defendant's refusal as consciousness of guilt. We explained that, on retrial in the defendant's case, "the State offered evidence sufficient to satisfy the third inference necessary to demonstrate

consciousness of guilt" when a detective testified that he told the defendant that "the warrant and blood test were 'in reference to [the victim]'s death.'" Id. at 576, 919 A.2d at 61. Thus, there was "a reasonable basis" from which the jury could find that the defendant was aware that law enforcement wanted his blood sample in connection with the murder investigation. Id. at 576-77, 919 A.2d at 61.

In so holding, we emphasized that, "[t]o be relevant, it is not necessary that evidence of this nature conclusively establish guilt. The proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt. If so, the evidence is relevant and generally admissible." Id. at 577, 919 A.2d at 61 (cleaned up) (emphasis in original). We also rejected the defendant's contention that "his reaction [, *i.e.*, refusing to submit to the blood test,] could have been due to religious objections or fear of needles, the sight of blood, pain, or possible infection"—*i.e.*, that there existed an innocent explanation for his refusal. Id. at 577, 919 A.2d at 61. We stated that, "[s]o long as the proper foundation is laid, consciousness of guilt evidence may be relevant and admissible." Id. at 578, 919 A.2d at 62. As such, "[s]imply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible." Id. at 578, 919 A.2d at 62. We further stated that, if there was innocent explanation for the defendant's conduct, "it was incumbent upon him to generate that issue[,]" but he failed to offer such an alternative theory at trial. Id. at 578, 919 A.2d at 62. We concluded that the trial court properly admitted evidence of the defendant's refusal to submit to the blood test as evidence of consciousness of guilt because "any possible prejudicial effect of [the defendant]'s struggle

- 48 -

to avoid the drawing of blood did not so clearly outweigh the probative value of the evidence so as to render the [trial] court's admission of the evidence an abuse of discretion." Id. at 580, 919 A.2d at 63 (cleaned up).

**Analysis**

Here, we hold that the circuit court properly permitted Brown to testify about Ford's reaction to being told that he had to leave her home—that he "cursed [her] out, and he slammed back the front door and left"—as evidence of consciousness of guilt. The circuit court did not err in determining that this evidence was relevant, and that it did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or considerations of cumulative evidence.[4]

Evidence of Ford's reaction to being told by Brown that he had to leave her home—namely, that he "cursed" at Brown and then "slammed back the front door and left[,]" *i.e.*, his post-crime conduct—was relevant to show Ford's state of mind, in that he was staying at Brown's home to hide from law enforcement and did not want to leave because he wanted to continue hiding out and elude capture. Ford's reaction to being told that he could not stay tended to show that he wanted to continue to hide from law enforcement because he was guilty. Indeed, the fact that Ford behaved in this particular way rendered more probable the fact that he was guilty. See Decker, 408 Md. at 641, 971 A.2d at 274 (cleaned

---

[4]To be sure, the circuit court did not explicitly state that the evidence was relevant and that the probative value was not substantially outweighed by the danger of unfair prejudice. Nevertheless, in ruling that the evidence was admissible as evidence of consciousness of guilt, the circuit court implicitly determined that the evidence was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice.

- 49 -

up). Thus, like flight after a crime, escape from confinement, and the like, Ford's post-crime conduct of hiding in his ex-girlfriend's home and becoming upset that he was made to leave was circumstantial evidence that was relevant "as a circumstance tending to show a consciousness of guilt." Id. at 640, 971 A.2d at 274 (cleaned up).

All four inferences that we have established for the admission of evidence of post-crime conduct as consciousness of guilt were satisfied in this case. See id. at 642, 971 A.2d at 275. Specifically, from evidence of Ford's reaction to being told that he could not stay at Brown's home, the jury could reasonably have drawn the following inferences: (1) from Ford's reaction to a desire to hide from law enforcement and elude capture; (2) from hiding to consciousness of guilt; (3) from consciousness of guilt to consciousness concerning the crime charged, *i.e.*, murder of Eltahir; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. Significantly, "[t]o be relevant, it is not necessary that evidence of this nature conclusively establish guilt. The proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt. If so, the evidence is relevant and generally admissible." Thomas II, 397 Md. at 577, 919 A.2d at 61 (cleaned up) (emphasis in original). Here, the evidence of Ford's reaction could support an inference that his conduct demonstrated consciousness of guilt. Thus, the circuit court did not err in concluding that evidence of Ford's reaction was, indeed, relevant to show consciousness of guilt.

Ford contends that evidence of his reaction failed to satisfy the first inference because there is an "alternative explanation" for his behavior that "is not a matter of speculation"—namely, that he "had a character trait for hot-temperedness or

- 50 -

aggressiveness," which would constitute inadmissible character evidence. Although Ford focuses on having a temper as an alternative explanation for his reaction, he also posits that there are other alternative explanations for his behavior, such as that his "reaction could have been caused by the fact that he had not taken his daily medications[,]" or being told to leave by Brown "could have triggered some hurt left over from the break-up of their romantic relationship." As we explained in Thomas II, 397 Md. at 578, 919 A.2d at 62, if there is an innocent explanation for a defendant's conduct, "it [i]s incumbent upon him [or her] to generate that issue." Ford had the opportunity to present evidence of an alternate explanation for his reaction—notably, one that did not involve him having a character trait for being hot-tempered or aggressive, as he claims—yet Ford did not avail himself of that opportunity.

In any event, the circumstance that there is the possibility of an innocent explanation for Ford's reaction is insufficient to render Brown's testimony inadmissible. See id. at 578, 919 A.2d at 62 ("Simply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible."). Rather, "[s]o long as the proper foundation is laid, consciousness of guilt evidence may be relevant and admissible." Id. at 578, 919 A.2d at 62. Indeed, the question is simply whether such "evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt[, and, i]f so, the evidence is relevant and generally admissible." Id. at 577, 919 A.2d at 61 (cleaned up) (emphasis in original). In this case, as explained above, the evidence of Ford's reaction to being told that he could not stay at Brown's home could support an inference that his conduct demonstrated a consciousness

of guilt, and thus was relevant. As such, even if Ford had presented an innocent explanation for his reaction that contradicted that inference of guilt, that would not mean that the evidence of his reaction did not have a tendency to show consciousness of guilt. As we noted in Decker, 408 Md. at 641, 971 A.2d at 274, "any evidence contradicting the inference of guilt [that is] derived from [post-crime conduct] does not render the evidence . . . inadmissible, but is merely to be considered by the jury in weighing the effect of such" post-crime conduct. (Cleaned up). In short, Ford could have offered, but did not offer, evidence of an innocent explanation for his reaction to being told by Brown to leave, and, even if he had, then it would have been up to the jury to weigh the effect of Ford's reaction.

We are unpersuaded by Ford's reliance on Thompson v. State, 393 Md. 291, 901 A.2d 208 (2006) and his contention that, in this case, "the proper inquiry [was] whether the evidence also reasonably supports a highly prejudicial inference that [requires] treating the evidence in a manner that would otherwise render the evidence inadmissible[,]" and, if so, then such "evidence is too ambiguous and equivocal to [serve as] evidence of consciousness of guilt evidence." (Cleaned up). In Thompson, id. at 294, 901 A.2d at 209, this Court held that a trial court abused its discretion in giving a jury instruction on flight. In that case, a detective investigating a shooting saw the defendant, who fit the description of the shooter, on a bicycle; the detective ran toward the defendant, identified himself as an officer, and yelled for him to stop; the defendant saw the detective, but pedaled away from him; and, shortly thereafter, the defendant was apprehended, and officers recovered a large amount of cocaine on the defendant. See id. at 294, 901 A.2d at 210. Before trial, the trial court ruled that the cocaine, the results of a chemical analysis, and the defendant's

statements to officers concerning his possession of the drugs were inadmissible, and the trial court dismissed the charges arising of out of his possession of controlled dangerous substances. See id. at 295, 901 A.2d at 210.

During a retrial on certain charges, a tape recording of the defendant's statements to officers that he fled was played for the jury, and a transcript of the statement was admitted, without objection. See id. at 296, 901 A.2d at 211. And, the detective from whom the defendant had fled testified that the defendant saw him, but pedaled away when he approached him. See id. at 297, 901 A.2d at 211. This Court noted that, although the defendant objected to the form of the questions, he did not object to the admission of evidence concerning his flight from police. See id. at 298, 901 A.2d at 212. At the conclusion of the trial, over the defendant's objection, the trial court gave a jury instruction on flight. See id. at 300, 901 A.2d at 213.

This Court held that the flight instruction was improper, explaining:

> The gravamen of the issue is whether [the defendant] fled in an attempt to avoid apprehension for the crimes for which he was on trial. In the present case, the jury was not presented with evidence of what may have been an alternative and at least a cogent motive for [the defendant]'s flight, specifically that drugs were found on his person. During his interview with police, [the defendant] asserted that he ran from them because he had drugs in his possession, which, according to the State, amounted to eighty-six vials of crack cocaine at the time of his arrest. He was in essence arrested *in flagrante delicto* with respect to the crime of possession of controlled dangerous substances. We find that this fact, which was known to all parties involved although not revealed to the jury, undermines the confidence by which the inference could be drawn that [the defendant]'s flight was motivated by a consciousness of guilt with respect to the crimes for which he was on trial in the present case; it provides a foundation for the alternate, and equally reasonable, inference that [the defendant] fled due to the cocaine in his possession, an action a person in his position may have taken irrespective of whether he also shot and attempted to rob [one of the victims]. [The

- 53 -

defendant] thus was placed in a difficult situation where he must either not object to the highly prejudicial evidence concerning his possession of a significant amount of cocaine being introduced to the jury to explain his flight (or perhaps forced to make a Hobson's choice to introduce such evidence himself), or decline to explain his flight and risk that the jury would not infer an alternative explanation for his flight.

Id. at 313-14, 901 A.2d at 221 (footnotes omitted). We further explained:

Where the defendant possesses an innocent explanation that does not risk prejudicing the jury against him, it would be expected that the defendant would present his purported reasons for his flight to the jury. It is error, however, for the trial [court] to give such an instruction in a case like the case *sub judice* where the defendant would be prejudiced by the revelation of the "guilty" explanation for his flight.

Id. at 315, 901 A.2d at 222.

Thompson is distinguishable from this case in several important respects, and is ultimately of no assistance to Ford with respect to evidence of his reaction being admitted as consciousness of guilt. Significantly, the issue in Thompson was the propriety of the trial court's giving of a jury instruction on flight. In this case, although the circuit court gave a jury instruction on flight that was similar to the instruction given in Thompson, id. at 300, 901 A.2d at 213, Ford did not object, nor has he raised any issue as to the propriety of the flight instruction.[5] Indeed, the issue here concerns the admissibility of Brown's testimony concerning how Ford reacted when she told him he could not stay at her home as evidence of consciousness of guilt; a similar issue was not raised in Thompson. Indeed, in Thompson, evidence of the defendant's flight was admitted during the trial without objection and the propriety of the instruction on flight was at issue. In Thompson, id. at

---

[5]We note that the circuit court's flight instruction did not reference, as possible evidence of Ford's consciousness of guilt, his reaction to being told to leave Brown's home.

313, 901 A.2d at 221, the alternate explanation for the defendant's flight was that he had eighty-six vials of crack cocaine on his person at the time of his arrest—evidence of a crime that would have been highly prejudicial to the defendant. By contrast, in this case, there were any number of alternative or innocent reasons that Ford could have presented to the jury to explain his reaction to being told to leave his ex-girlfriend's home. In short, Ford did not face the same Hobson's choice that the defendant in Thompson did. And, although flight is not at issue in this case, Ford's behavior satisfied the test set forth in Decker for the admission of post-crime conduct as evidence of consciousness of guilt.[6]

We conclude that the circuit court did not err in admitting evidence of Ford's

---

[6]For the same reason, we are unconvinced by Ford's reliance on Bedford v. State, 317 Md. 659, 566 A.2d 111 (1989). In Bedford, id. at 666, 566 A.2d at 114, the defendant, who had been charged with first-degree murder, robbery, and rape, was scheduled to be transported to a psychiatrist's office outside of the prison complex. As part of a routine procedure, he was strip-searched and found to have a four-inch piece of metal wire sharpened to a point and wrapped in toilet paper in his long johns. See id. at 666, 566 A.2d at 114-15. At trial, the officer who conducted the search testified that such instruments were used to open handcuff locks, and the wire was admitted into evidence. See id. at 666-67, 566 A.2d at 115. In this Court, the defendant argued that the wire could have been used for other purposes contradicting a consciousness of guilt, such as "a defensive or offensive weapon, [or] as a tool for intra-prison work activity[.]" Id. at 667, 566 A.2d at 115. We doubted that the wire could be used as a work tool, but "accept[ed] that its presence could lead the jury to other inferences about" the defendant, explaining: "The jury could consider it a weapon and view [the defendant] as being violent, or could see the defendant's possession of the wire as a breaking of the rules. Consequently, it could view [the defendant] as a 'bad man' for breaking such a rule." Id. at 668, 566 A.2d at 115. As such, we held: "Because the possession of the wire is so equivocal, we hold that its admission into evidence was more prejudicial to [the defendant] than probative of an intent to escape and should have been excluded." Id. at 668, 566 A.2d at 115. This case is distinguishable from Bedford because there were several alternative, innocent reasons that Ford could have presented to the jury to explain his reaction, including hurt over his break-up with Brown or a side effect of failing to take his medication, that would not have led to the negative inference that he was violent or a bad man who broke rules, as with the defendant in Bedford.

- 55 -

reaction to being told he had to leave Brown's home as evidence of consciousness of guilt, as such evidence was relevant. We also conclude that the circuit court did not abuse its discretion in admitting Brown's testimony, *i.e.*, in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or considerations of cumulative evidence. As Maryland Rule 5-403 recognizes, even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." Based on this case's circumstances, however, it is clear that the circuit court did not abuse its discretion in weighing the evidence and concluding that the probative value was not substantially outweighed by the danger of unfair prejudice.

Here, the evidence of Ford's reaction was highly probative. The record reflects that, shortly after stabbing Eltahir, *i.e.*, the same evening, Ford showed up unannounced at Brown's home. Ford asked Brown whether he could stay at her home for a while because he had gotten into a fight with a friend, the friend had hit him, "and he [had] stabbed him." Ford told Brown more about the incident, and ultimately, Brown permitted Ford to stay the night. The next morning, however, Brown told Ford that he could not stay at her home and "that he had to go." In other words, the morning following the stabbing, Brown sought to have Ford leave her home, and he reacted by cursing at her, "slamm[ing] back the front door[,]" and leaving. Significantly, when Brown testified about Ford's reaction to being told to leave, she did not allege that Ford hit or threatened her or engaged in any violent behavior; rather, as Brown testified, Ford was "upset[.]" Although Ford's reaction demonstrated that he was upset about being asked to leave his hiding place, it did not rise

to the level of indicating that he was violent.

We are unpersuaded by Ford's contention that there was "danger of the jury taking [his] reaction to Brown as evidence of the character trait of hot-temperedness or aggressiveness and his stabbing Eltahir in conformity therewith." As explained above, there were innocent explanations that Ford could have offered to explain his reaction to being told to leave Brown's home, but he did not do so. And, in any event, Ford's reaction did not demonstrate that he was violent or assaultive, only that he was upset about being asked to leave his hiding place.[7]

Moreover, even if evidence of Ford's reaction to being told he had to leave Brown's home was prejudicial, that does not mean that it was "unfairly" prejudicial such that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Indeed, in Odum v. State, 412 Md. 593, 615, 989 A.2d 232, 245 (2010), we explained that "the fact that evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in [Maryland] Rule 5-403."

---

[7]Ford points to statements by the prosecutor in closing argument to support the contention that the prosecutor called the jury's attention to temper as the alternate reason for his reaction. During the State's closing argument, the prosecutor stated that Eltahir was a "quiet, peaceful guy[,]" whereas Ford was "the man who raged around the house, cursing and slamming doors when he was told he had to leave." Ford's counsel objected, and the circuit court sustained the objection. The prosecutor then stated that, when Brown asked Ford to leave, "[h]is reaction was that he cursed, slammed doors, and raged around. You can contrast that with [Eltahir,] who was easy[]going." Ford's counsel did not object to that statement. Ultimately, no issue as to the State's closing argument is before us because Ford's counsel's objection to the prosecutor's first statement was sustained, and Ford's counsel did not object to the prosecutor's second statement. Indeed, Ford raised an issue only with respect to Brown's testimony about his reaction, not about the State's closing argument.

(Cleaned up). Rather, "[e]vidence may be unfairly prejudicial if it might influence the jury to disregard the evidence or lack of evidence regarding the particular crime with which he [or she] is being charged." Id. at 615, 989 A.2d at 245 (cleaned up). Here, in weighing the evidence, the circuit court implicitly determined that it was not unfairly prejudicial; and, on review, we decline to conclude such a weighing constituted an abuse of discretion.

We similarly reject Ford's argument that the circuit court abused its discretion because there was "other putative 'consciousness of guilt' evidence," and, as such, evidence of his reaction was "cumulative" and "completely outweighed" by the danger of unfair prejudice. The mere fact that evidence may be cumulative does not mean that the evidence is unfairly prejudicial. Indeed, Maryland Rule 5-403 couches cumulativeness in terms of the "needless presentation of cumulative evidence." As such, although other evidence of consciousness of guilt was adduced at trial—such as Ford fleeing the scene of the crime and concealing the knife with which he stabbed Eltahir on his mother's property—it was entirely within the circuit court's discretion to conclude that evidence of Ford's reaction to being asked to leave Brown's home was admissible and not cumulative.

## CONCLUSION

In sum, by its plain language, Maryland Rule 5-404(a)(2)(C) does not permit a prosecutor to offer evidence of an alleged victim's trait of peacefulness to rebut statements made by defense counsel in opening statement because opening statements are not evidence. Ford's counsel's remarks during opening statement did not "open the door" for the State to present evidence of Eltahir's trait of peacefulness. As such, the circuit court erred in permitting the State, over Ford's objection, to elicit testimony in its case-in-chief

from McQueen and Kane about Eltahir's trait of peacefulness.  Nevertheless, we conclude the error was harmless beyond a reasonable doubt.

We hold that the circuit court properly permitted Brown to testify about Ford's reaction to being told that he had to leave her home as evidence of consciousness of guilt, as the evidence was relevant, and it was not an abuse of discretion to determine that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice or considerations of cumulative evidence.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  PETITIONER TO PAY COSTS.**